## IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Premier Exhibitions, Inc., *et al.*,[1] | Case No. 3:16-bk-02232-PMG |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT TO ACCOMPANY PLAN OF LIQUIDATION
## OF THE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

NELSON MULLINS RILEY
& SCARBOROUGH LLP
Daniel F. Blanks (FL Bar No. 88957)
Lee D. Wedekind, III (FL Bar No. 670588)
50 N. Laura Street, Suite 4100
Jacksonville, FL 32202
Telephone:    (904) 665-3656
Facsimile:    (904) 665-3699
daniel.blanks@nelsonmullins.com
lee.wedekind@nelsonmullins.comf

TROUTMAN SANDERS LLP
Harris B. Winsberg (FL Bar No. 0127190)
Matthew R. Brooks (admitted *pro hac vice*)
600 Peachtree Street NE, Suite 3000
Atlanta, GA 30308
(404) 885-3000 (phone)
(404) 962-6990 (fax)
harris.winsberg@troutman.com
matthew.brooks@troutman.com

Dated: May 15, 2019
Jacksonville, Florida

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Premier Exhibitions, Inc. (4922); Premier Exhibition Management LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309).  The Debtors' service address is c/o Troutman Sanders, LLP, 600 Peachtree Street, NE, Suite 3000, Atlanta, GA 30308.

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1
    A.    Disclaimer ...................................................................................................1
    B.    Disclosure Statement ...................................................................................3
    C.    Plan Overview. ............................................................................................3
    D.    Summary of Distributions under the Plan. ..................................................4
    E.    Notice of Limited Consolidation. ...............................................................5
    F.    Background .................................................................................................6
    G.    Solicitation of Acceptance. .........................................................................6

II.    GENERAL INFORMATION CONCERNING THE DEBTORS ...................................7
    A.    The Debtors' Corporate Structure. ..............................................................7
        1.    PRXI .............................................................................................7
        2.    PRXI's Subsidiaries ......................................................................7
    B.    The Debtors' Businesses. ............................................................................8
        1.    RMST ...........................................................................................8
        2.    PRXI and the Other Subsidiaries ..................................................8
    C.    The Artifacts. .............................................................................................8
        1.    An Overview .................................................................................8
    D.    Pre-Petition Capital Structure. ..................................................................10
    E.    Corporate Governance and Management. ...................................................10
        1.    Current Board of Directors ..........................................................10
        2.    Executive Officers ......................................................................11
    F.    Key Event Leading to the Filing of These Chapter 11 Cases ......................11

III.    THESE CHAPTER 11 CASES .............................................................................12
    A.    The Debtors' Post-Petition Financial Performance. ...................................12
    B.    "First Day" and Other Initial Orders. ........................................................12
    C.    Retained Professionals. .............................................................................12
    D.    Schedules and Statements. ........................................................................13
    E.    Official Committees. .................................................................................13
        1.    Official Committee of Unsecured Creditors .................................13
        2.    Official Committee of Equity Security Holders ............................13
    F.    Bar Date ...................................................................................................14
    G.    Post-Petition Financing. ............................................................................14
        1.    Cash Collateral ...........................................................................14
        2.    DIP Financing ............................................................................14
    H.    KERP/KEIP Motion and Order. ................................................................14
    I.    Settlement of Certain Claims. ...................................................................15
        1.    James Beckman and Image Quest .................................................15
        2.    Fifth Ave ....................................................................................15
        3.    PacBridge Parties Settlement .......................................................15
    J.    Attempts to Sell the Titanic Artifacts .......................................................15
        1.    Initial Attempt to Sell the French Artifacts ..................................15
        2.    Contemplated Auction of the Titanic Artifacts .............................16

# TABLE OF CONTENTS
(continued)

**Page**

|   |   |   |   |
|---|---|---|---|
| | | 3. | The PSA and the PacBridge Offer .......................................................17 |
| | | 4. | The "Naked Auction" ..........................................................................17 |
| | K. | Mediation. ..............................................................................................................18 |
| | L. | Extension of Exclusivity; Expiration. ...................................................................18 |
| | M. | Trustee Motion. ......................................................................................................18 |
| | N. | D&O Litigation. ......................................................................................................19 |
| | O. | Purchase Agreement; Competing Plans. .................................................................19 |
| | | 1. | EC Plan ...............................................................................................19 |
| | | 2. | Purchase Agreement ...........................................................................19 |
| | | 3. | CC Plan ...............................................................................................20 |
| | | 4. | Abatement of Initial Hearing ..............................................................21 |
| | | 5. | Outcome of Omnibus Hearing .............................................................21 |
| | P. | Cancellation of Auction and Designation of PAHL as Winning Bidder. .............21 |
| | Q. | Approval of Sale to Premier Acquisition. ..............................................................22 |
| | | 1. | Bankruptcy Court Approval.................................................................22 |
| | | 2. | Admiralty Court Approval ...................................................................22 |
| | R. | Impact of the Approval Process..............................................................................22 |
| | S. | Central Elements of Purchase Agreement as It Relates to the Plan.......................23 |
| | | 1. | Transferred Assets ..............................................................................23 |
| | | 2. | Purchase Price ....................................................................................23 |
| | | 3. | PacBridge Parties Settlement ..............................................................24 |
| | | 4. | Dismissal of RMST .............................................................................24 |
| IV. | | CLASSIFICATION OF CLAIMS AND INTERESTS.................................................25 |
| | A. | Introduction. ...........................................................................................................25 |
| | B. | Classifications. .......................................................................................................25 |
| V. | | DESCRIPTION OF CLAIMS AND TREATMENT UNDER THE PLAN ...................25 |
| | A. | Unclassified Claims. ..............................................................................................25 |
| | | 1. | Administrative Expense Claims ...........................................................25 |
| | | 2. | Priority Tax Claims .............................................................................26 |
| | B. | Unimpaired Classes of Claims and Interests. .........................................................26 |
| | | 1. | Class 1: Priority Claims ......................................................................26 |
| | C. | Impaired Classes of Claims and Interests...............................................................26 |
| | | 1. | Class 2: Unsecured Claims ..................................................................27 |
| | | 2. | Class 3: PRXI Equity Interests ...........................................................27 |
| | | 3. | Class 4: Subsidiary Equity Interests ...................................................27 |
| VI. | | MEANS FOR IMPLEMENTATION.............................................................................27 |
| | A. | Limited Consolidation............................................................................................27 |
| | B. | Creation of Liquidating Trust. ...............................................................................29 |
| | C. | Transfer and Vesting of Assets to the Liquidating Trust. .....................................30 |
| | D. | Treatment of Liquidating Trust for Federal Income Tax Purposes; No Successor-in-Interest...........................................................................................30 |
| | E. | Rights and Obligations of the Liquidating Trustee................................................31 |

# TABLE OF CONTENTS
(continued)

**Page**

|  |  |  |  |
|---|---|---|---|
| | F. | Post-Confirmation Report of Liquidating Trust. | 32 |
| | G. | Dissolution of Liquidating Trust | 32 |
| | H. | The Committees and the Liquidating Trust Oversight Committee | 32 |
| | I. | Further Transactions. | 32 |
| | J. | Administration of Claims. | 33 |
| | K. | Preservation of Rights of Action. | 34 |
| VII. | | DISTRIBUTIONS TO HOLDERS OF CLAIMS | 34 |
| | A. | Date of Distributions. | 34 |
| | B. | Address for Distributions. | 34 |
| | C. | Payments by Cash. | 35 |
| | D. | Rounding. | 35 |
| | E. | No Interest on Claims. | 35 |
| | F. | One Distribution Per Holder. | 35 |
| | G. | Effect of Preconfirmation Distributions. | 36 |
| | H. | Disputed Claims. | 36 |
| | I. | Procedures for Resolving Disputed Claims. | 36 |
| VIII. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 37 |
| | A. | Rejection of Executory Contracts and Unexpired Leases; Approval. | 37 |
| | B. | Claims under Rejected Executory Contracts and Unexpired Leases. | 37 |
| | C. | Assumption and Assignment of Contracts. | 38 |
| | D. | Inclusiveness. | 38 |
| IX. | | CONDITIONS PRECEDENT TO THE EFFECTIVENESS OF PLAN | 38 |
| | A. | Confirmation Order Must Be Entered. | 38 |
| | B. | Confirmation Order Must Not Be Stayed, Reversed, Modified or Amended. | 38 |
| | C. | Provisions of the Confirmation Order. | 38 |
| | D. | Appointment of Liquidating Trustee. | 38 |
| | E. | All Plan Actions, Documents and Agreements Have Been Executed. | 39 |
| | F. | All Necessary Approvals or Consents Have Been Obtained. | 39 |
| X. | | VOTING ON THE PLAN AND THE CONFIRMATION PROCESS | 39 |
| | A. | Classes Entitled to Vote. | 39 |
| | B. | Impairment Controversies. | 39 |
| | C. | Voting. | 40 |
| | D. | Voting Instructions. | 40 |
| | E. | Requirements of Confirmation. | 41 |
| | | 1. Acceptance by at Least One Impaired Class | 41 |
| | | 2. Best Interests Test | 41 |
| | | 3. Feasibility of the Plan | 42 |
| | | 4. Classification of Claims | 42 |
| | F. | Additional Requirements of Section 1129(b) of the Bankruptcy Code. | 42 |
| | G. | Objections to Confirmation. | 43 |

# TABLE OF CONTENTS
### (continued)

**Page**

|  | H. | Hearing on Confirmation of the Plan. | 43 |
| XI. |  | DISCHARGE, RELEASE, LIMITATIONS OF LIABILITY, AND GENERAL INJUNCTION UNDER THE PLAN | 43 |
|  | A. | Plan Injunction. | 43 |
|  | B. | Exculpation from Liability. | 44 |
|  | C. | Preservation of Insurance. | 45 |
|  | D. | Continuation of Automatic Stay. | 45 |
|  | E. | Binding Effect of Plan. | 45 |
|  | F. | No Liability for Tax Claims. | 46 |
|  | G. | No Liability for Untimely Administrative Expense Claims. | 46 |
|  | H. | Regulatory or Enforcement Actions. | 46 |
| XII. |  | FEDERAL TAX CONSIDERATIONS | 46 |
|  | A. | General. | 46 |
|  | B. | Federal Income Tax Consequences to Holders of Claims. | 48 |
|  | C. | Tax Treatment of Liquidating Trust and Contribution of Assets. | 48 |
|  | D. | Accrued Interest. | 49 |
|  | E. | Backup Withholding. | 50 |
|  | F. | Not Intended as Tax Advice. | 50 |
| XIII. |  | LIQUIDATION ANALYSIS | 50 |
| XIV. |  | MISCELLANEOUS PLAN PROVISIONS | 51 |
|  | A. | No Admissions. | 51 |
|  | B. | Revocation or Withdrawal of the Plan. | 51 |
|  | C. | Further Assurances. | 51 |
|  | D. | Headings. | 51 |
|  | E. | Governing Law. | 51 |
|  | F. | Entire Agreement. | 52 |
|  | G. | Closing of Case/ Charitable Contribution. | 52 |
| XV. |  | RETENTION OF JURISDICTION | 52 |
| XVI. |  | MODIFICATIONS AND AMENDMENTS | 54 |
| XVII. |  | CONCLUSION | 54 |

# I.
## INTRODUCTION

This Disclosure Statement (the "**Disclosure Statement**") is filed in accordance with Section 1125 of Title 11, United States Code (as amended and supplemented, the "**Bankruptcy Code**"), by Premier Exhibitions, Inc. ("**PRXI**"), Premier Exhibitions Management, LLC ("**PEM**"), Arts and Exhibitions International, LLC ("**AEI**"), Premier Exhibitions International, LLC ("**PEI**"), Premier Exhibitions NYC, Inc. ("**Premier NYC**"), Premier Merchandising, LLC ("**Premier Merch**"), and Dinosaurs Unearthed Corp. ("**Dinosaurs**" and, collectively with PRXI, PEM, AEI, PEI, Premier NYC, and Premier Merch, the "**Debtors**") as debtors and debtors-in-possession in the above-captioned Chapter 11 cases (the "**Chapter 11 Cases**"), to provide information to all known creditors about the *Plan of Liquidation of the Debtors Under Chapter 11 of the Bankruptcy Code* filed on May 15, 2019 (as it may be amended or supplemented from time to time, the "**Plan**"), a copy of which is attached hereto as **Exhibit 1**. The purpose of the Disclosure Statement is to provide information of a kind and in detail sufficient to enable Creditors in certain Impaired Classes to make an informed judgment regarding whether to accept or reject the Plan and to inform Holders of Claims in the Unimpaired Classes of their treatment under the Plan. The information contained in this Disclosure Statement is provided by the Debtors. The Debtors (hereinafter occasionally to referred to as the "**Plan Proponents**") urge parties in interest to read this Disclosure Statement and the Plan carefully prior to casting votes for or against the Plan.

Unless otherwise defined herein, capitalized terms used herein shall have the same meaning ascribed to them in the Plan.

A.   **Disclaimer.**

**ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS AND THE DISCLOSURE STATEMENT AS A WHOLE.**

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. FOR THE FOREGOING REASONS, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT**

ANY INACCURACY OR OMISSION. THE FINANCIAL DATA SET FORTH HEREIN, EXCEPT AS OTHERWISE SPECIFICALLY NOTED, HAS NOT BEEN SUBJECTED TO AN INDEPENDENT AUDIT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF. NO ASSURANCES EXIST THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME HEREAFTER.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN, AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY OTHER REPRESENTATIONS OR INDUCEMENTS MADE TO SOLICIT YOUR ACCEPTANCE THAT ARE NOT CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION TO ACCEPT OR REJECT THE PLAN. FURTHERMORE, SUCH OTHER REPRESENTATIONS OR INDUCEMENTS SHOULD BE IMMEDIATELY REPORTED TO COUNSEL FOR THE DEBTORS. COUNSEL FOR THE DEBTORS MAY, IN TURN, COMMUNICATE SUCH INFORMATION TO THE BANKRUPTCY COURT FOR APPROPRIATE ACTION.

WITH RESPECT TO ADVERSARY PROCEEDINGS, CONTESTED MATTERS, OR OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER. INSTEAD, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE STATEMENTS MADE IN CONNECTION WITH SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY. FURTHERMORE, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE LEGAL EFFECTS, INCLUDING, BUT NOT LIMITED TO, THE TAX EFFECTS, OF THE PROPOSED PLAN. YOU SHOULD CONSULT YOUR LEGAL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS REGARDING THE TAX OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

MUCH OF THE INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED AND WAS DERIVED FROM THE DEBTORS' BOOKS AND RECORDS, WHICH ARE DEPENDENT UPON INTERNAL ACCOUNTING METHODS. AS A RESULT, VALUATIONS OF ASSETS AND CLAIM LIABILITIES ARE ESTIMATED. ALTHOUGH SUBSTANTIAL EFFORT HAS BEEN MADE TO BE COMPLETE AND ACCURATE, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THE FULL AND COMPLETE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

B.    <u>**Disclosure Statement.**</u>

This Disclosure Statement sets forth certain information regarding the Debtors' Prepetition history and Post-petition activity.  This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan.  In addition, the Disclosure Statement discusses the confirmation process and voting procedures that Holders of Claims in Impaired Classes must follow for their votes to be counted.

**WHEN AND IF CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  THUS, ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY. IN PARTICULAR, HOLDERS OF IMPAIRED CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, THE PLAN, AND ANY EXHIBITS OR SUPPLEMENTS TO THE PLAN OR DISCLOSURE STATEMENT, CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

C.    <u>**Plan Overview.**</u>

The following is a brief overview of the Plan, which is qualified in its entirety by reference to the Plan.

Under the Plan, a single liquidating trust (the "**Liquidating Trust**") will be established for the benefit of Creditors of the Debtors.  The Liquidating Trust will succeed to all Assets of the Debtors (including, but not limited to, the Sale Proceeds and all Causes of Action).  The Liquidating Trust will, among other things, liquidate the non-Cash Assets transferred to the Liquidating Trust (including the prosecution of Causes of Action), reconcile all Claims against the Debtors, make Distributions to Holders of Allowed Claims against the Debtors as provided in the Plan, and otherwise wind down these Chapter 11 Cases and the Debtors' respective Estates.

Additionally, the Plan provides that upon the Effective Date, the Debtors' officers, directors, members, managers or any other Person exercising control over the affairs of the Debtors shall be deemed to have resigned without the necessity of any further action or writing, and they shall be released from responsibilities, duties, and obligations arising after the Effective Date to the Debtors or their Creditors under the Plan and applicable law.  On or after the Effective Date, the Plan further provides that the Liquidating Trustee may dissolve the Debtors.

The Plan designates a series of Classes of Claims and Interests for the Debtors. These Classes take into account the differing nature of the various Claims and Interests, as well as their relative priority under the Bankruptcy Code. Because the Plan requires the limited consolidation of the Debtors for the purposes of voting on, confirmation of, and Distributions under the Plan, Claims and Interests are not separated out by each individual Debtor.

**D.      Summary of Distributions under the Plan.**

The chart below summarizes the treatment, timing and percentage distributions to each Class under the Plan. For a further discussion, see Article IV below.

| Class No. | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Amount and Projected Recovery | Voting Right |
|---|---|---|---|---|
| -- | Administrative Expense Claims | Paid in full and in Cash, without interest, on or as soon as practicable (a) on the Effective Date, or (b) if (x) incurred postpetition by a Debtor in the ordinary course of its businesses or (y) arising pursuant to one or more postpetition agreements or transactions entered into by any Debtor with Bankruptcy Court approval, then such postpetition Administrative Expense Claims shall be paid in accordance with the terms and conditions of the particular transaction(s) and any agreement(s) relating thereto. | Estimated Amount: $3,230,000.00<br><br>Estimated Recovery: 100% of Allowed Amount | Unimpaired and not entitled to vote |
| -- | Priority Tax Claims | Paid in Cash in full on the Effective Date or as soon thereafter as is reasonably practicable, but in no event later than the end of five (5) years from the Petition Date regular quarterly installments in Cash through and including the date such Allowed Priority Tax Claim is paid in full. If paid over time, the Holder shall receive interest at the Section 6621 Interest Rate (or the applicable statutory rate under state law). | Estimated Amount: $253,000<br><br>Estimated Recovery: 100% of Allowed Amount | Unimpaired and not entitled to vote |
|  |  |  |  |  |

38680380

| Class No. | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Amount and Projected Recovery | Voting Right |
|---|---|---|---|---|
| 1 | Priority Claims | Paid in full on the later of (1) the Effective Date or as soon as reasonably practicable thereafter, and (2) for Claims in Class 1 that were Disputed Claims and thereafter became Allowed Priority Claims, immediately following the date upon which such Claims became Allowed Priority Claims, or as soon as reasonably practicable thereafter. | Estimated Amount: [•] Estimated Recovery: 100% of Allowed Amount | Unimpaired and not entitled to vote |
| 2 | Unsecured Claims | Paid as soon as is reasonably practicable following the Effective Date, as determined by the Liquidating Trustee in his or her sole discretion, and on each Distribution Date thereafter, each Holder of an Allowed Unsecured Claim shall receive its Pro Rata share of the Net Distributable Assets. | Estimated Amount: $11,215,000.00 Estimated Recovery: 63.5% of Allowed Amount | Impaired and entitled to vote. |
| 3 | PRXI Equity Interests | Holders of PRXI Equity Interests shall not receive or retain any property under the Plan, and on the Effective Date such Equity Interests will be cancelled. | Estimated Recovery: $0.00 | Deemed to reject and not entitled to vote |
| 4 | Subsidiary Equity Interests | Holders of Subsidiary Equity Interests shall not receive or retain any property under the Plan, and on the Effective Date such Equity Interests will be cancelled. | Estimated Recovery: $0.00 | Deemed to reject and not entitled to vote |

The liability estimates outlined in the above chart are estimates only and may change as the result of any Claims Litigation or other events affecting the Debtors' Estates and their Assets. Estimated distributions do not take into account any proceeds resulting from successful pursuit of Causes of Action following the Effective Date. Such additional recoveries may increase the estimated distributions for Class 2.

E.    **Notice of Limited Consolidation.**

PLEASE TAKE NOTICE THAT THE PLAN PROVIDES FOR LIMITED CONSOLIDATION OF THE DEBTORS' ASSETS AND LIABILITIES INTO A SINGLE ESTATE. THE PLAN PROVIDES THAT THE ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE APPROVAL, PURSUANT TO SECTION 105(a) OF THE

38680380

BANKRUPTCY CODE, OF THE LIMITED CONSOLIDATION OF PRXI, PEM, AEI, PEI, PREMIER NYC, AND PREMIER MERCH (COLLECTIVELY, THE "**CONSOLIDATED DEBTORS**") AND THEIR BANKRUPTCY ESTATES FOR ALL PURPOSES RELATED TO CLAIMS AND DISTRIBUTION OF ASSETS UNDER THE PLAN. AS A RESULT, ON AND AFTER THE CONFIRMATION DATE (I) ALL ASSETS AND LIABILITIES OF THE CONSOLIDATED DEBTORS AND THEIR ESTATES SHALL BE TREATED AS THOUGH THEY WERE MERGED WITH AND INTO PRXI; (II) NO DISTRIBUTIONS SHALL BE MADE UNDER THE PLAN ON ACCOUNT OF ANY CLAIM HELD BY ANY OF THE DEBTORS AGAINST ANY OTHER DEBTOR PARTY; (III) ALL GUARANTEES OF ANY CONSOLIDATED DEBTOR OF THE OBLIGATIONS OF ANY OTHER DEBTOR SHALL BE ELIMINATED; AND (IV) EACH AND EVERY CLAIM AND PROOF OF CLAIM AGAINST ANY OF THE CONSOLIDATED DEBTORS SHALL BE DEEMED ONE CLAIM OR PROOF OF CLAIM AGAINST ALL OF THE CONSOLIDATED DEBTORS AND A SINGLE OBLIGATION OF THE CONSOLIDATED ESTATE ON AND AFTER THE CONFIRMATION DATE. ADDITIONALLY, THE LIMITED CONSOLIDATION EFFECTED PURSUANT TO THE PLAN SHALL NOT CREATE DEFENSES TO ANY AVOIDANCE ACTION OR CAUSE OF ACTION OR REQUIREMENTS FOR ANY THIRD PARTY TO ESTABLISH MUTUALITY IN ORDER TO ASSERT A RIGHT OF SETOFF. FOR THE REASONS SET FORTH IN GREATER DETAIL BELOW IN ARTICLE VI, SECTION A OF THE DISCLOSURE STATEMENT, THE DEBTORS BELIEVE THAT THE REQUIREMENTS FOR LIMITED CONSOLIDATION ARE MET IN THESE CHAPTER 11 CASES AND THAT LIMITED CONSOLIDATION IS NECESSARY TO ENSURE EQUITABLE TREATMENT OF CREDITORS.

## F.    <u>Background.</u>

On June 14, 2016 (the "**Petition Date**"), the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida (the "**Bankruptcy Court**"), thereby commencing these Chapter 11 Cases. These Chapter 11 Cases were originally jointly administered under the lead case of *In re: RMS Titanic, Inc.* (Case No. 3:16-bk-02230). *See* [Case No. 3:16-bk-2230; Docket No. 100]. Following the dismissal of the RMST case on March 11, 2019 [Docket No. 1336] (discussed below), the remaining Chapter 11 Cases became jointly administered under the lead case of *In re: Premier Exhibitions, Inc.* (Case No. 3:16-bk-2232). Accordingly, refer to Case No. 3:16-bk-2230 for Docket entries prior to March 11, 2019.

The Debtors have filed simultaneously with this Disclosure Statement their Plan. The Debtors, as proponents of the Plan, distribute this Disclosure Statement together with the Plan to solicit acceptances of the Plan. This introductory section is qualified in its entirety by the detailed explanations that follow and the provisions of the Plan. In the event of conflict between anything stated in this Disclosure Statement and the Plan, the terms of the Plan will control.

## G.    <u>Solicitation of Acceptance.</u>

Pursuant to a Court Order dated [•], 2019, Holders of Class 2 Claims may vote to accept or reject the Plan no later than [•], 2019 (the "**Voting Deadline**"). A Ballot with which to indicate and file an acceptance or rejection of the Plan has been provided to you. You must complete and

- 6 -

file your Ballot on or before the Voting Deadline for your vote to count. Any Ballot that is executed by the Holder of any Allowed Claim but does not indicate acceptance or rejection of the Plan shall not be counted for the purposes of determining acceptance or rejection of the Plan. Any other Ballot not filed in accordance with the instructions on the Ballot shall not be counted for the purposes of determining acceptance or rejection of the Plan.

*THE DEBTORS HEREBY SOLICIT APPROVAL OF THE PLAN BY THEIR CREDITORS. THE DEBTORS BELIEVE THE PLAN PROVIDES THE OPTIMUM RETURN TO CREDITORS AND THAT LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE WOULD RESULT IN A REDUCED DISTRIBUTION TO UNSECURED CREDITORS. THE DEBTORS URGE EACH CREDITOR TO VOTE IN FAVOR OF THE PLAN BY MARKING THE "ACCEPTS" BOX ON THE ENCLOSED BALLOT AND FILING IT IN ACCORDANCE WITH THE INSTRUCTIONS PRINTED THEREON ON OR BEFORE THE VOTING DEADLINE.*

## II.
## GENERAL INFORMATION CONCERNING THE DEBTORS

### A.   The Debtors' Corporate Structure.

####   1.   **PRXI**

The principal Debtor, PRXI, is a Florida corporation that was incorporated on July 28, 2004. It is a publicly held company, and its major shareholders and their approximate percentage ownership interests are: Ms. Lange Feng (approximately 669,643 shares or 7.2%); Mr. Jihe Zhang (approximately 446,429 shares or 4.8%); High Nature Holding Limited, a company organized under the laws of the British Virgin Islands (approximately 1,116,071 shares or 11.9%); Mandra Forestry Limited, a company organized under the laws of the British Virgin Islands (approximately 781,250 shares or 8.3%); funds managed by affiliates of Alta Fundamental Advisers LLC ("**Alta**") (approximately 1,057,624 shares or 11.3%); and funds managed by affiliates of Apollo Global Management, LLC ("**Apollo**") (approximately 463,038 shares or 4.9%). Mr. Daoping Bao[2] and Ms. Nancy Brenner, collectively, own 1,434,720 shares of 1032403 B.C. Ltd. (the "**BC Shares**"). The BC Shares are exchangeable on a share-for-share basis for an equivalent number of shares in PRXI (split 1,271,994 for Mr. Bao and 162,726 for Ms. Brenner); however, the BC Shares have not been exchanged.

PRXI was publicly traded on the NASDAQ under the symbol **PRXI** until February 10, 2016 when PRXI was delisted. PRXI currently is traded on "pink slips" over the counter under the symbol **PRXIQ**.

####   2.   **PRXI's Subsidiaries**

As of the Petition Date, PEI, Premier Merch, and RMST each were direct subsidiaries wholly-owned by PRXI. Dinosaurs is an indirect, wholly-owned subsidiary of PRXI. PEM is a direct subsidiary of PRXI, in which PRXI has a 90% ownership interest and AEG Presents LLC *f/k/a* AEG Live LLC, a California limited liability company and a non-Debtor herein, has a 10%

---

[2] Mr. Bao has voting control over approximately 4,448,113 (47.5%) shares of PRXI due to a shareholder voting agreement.

ownership interest.  PEM, in turn, wholly-owns Premier NYC and AEI.

## B.    The Debtors' Businesses.

### 1.    RMST[3]

RMST is the successor-in-interest to Titanic Ventures Limited Partnership ("**TVLP**"), a Connecticut limited partnership, which was formed in 1987 for the purposes of exploring the wreck of the *R.M.S. Titanic* (the "*Titanic*") and its surrounding oceanic areas.  In May of 1993, RMST entered into a reverse merger under which RMST acquired all of the assets and assumed all of the liabilities of TVLP, and TVLP became a shareholder of RMST.  In October of 2004, the companies reorganized and PRXI became the parent company of RMST, and RMST became a wholly-owned subsidiary.

RMST owns the rights to the *Titanic* assets.  Specifically, RMST owns, among other things, all of the intellectual property (data, video, photos, maps, etc.) related to the recovery of the artifacts and scientific study of the ship.  In addition, RMST owns the rights to the largest single collection of artifacts and cultural items ever recovered from the *Titanic* – in total, approximately 5,500 individual pieces (collectively, the "**Titanic Artifacts**").  RMST is also the savlor-in-possession with respect to *Titanic*.

### 2.    PRXI and the Other Subsidiaries

PRXI and its subsidiaries engaged in the business of presenting to the public museum-quality touring exhibitions around the world.  Since PRXI's establishment, it developed, deployed, and operated unique exhibition products that were presented to the public in exhibition centers, museums, and non-traditional venues.

PRXI first became known for its "Titanic: the Artifact Exhibition," which presents the tragic story of the eponymous ill-fated ocean liner.  In 2004, PRXI (through its subsidiaries) diversified its exhibitions beyond the *Titanic*, with other exhibitions including, but not limited to: "BODIES … The Exhibition"; "BODIES Revealed"; "Saturday Night Live: The Experience"; "The Discovery of King Tut"; "Dinosaurs Unearthed"; "Extreme Dinosaurs"; "Xtreme BUGS"; "Dinosaurs Alive!" and "Creatures of the Deep."

During these Chapter 11 Cases, as described in greater detail below, the Debtors sold 100% of the stock in RMST, along with substantially all of their other assets, to Premier Acquisition. Accordingly, PRXI is no longer engaged in any ongoing business activities, and RMST is no longer a debtor in these Chapter 11 Cases.

## C.    The Artifacts.

### 1.    An Overview

The Titanic Artifacts were not recovered and brought ashore all at once.  Instead, slightly

---

[3] As discussed in Section III.S.4, *infra*, RMST has been dismissed as a Debtor in these Chapter 11 cases.

less than half of the Titanic Artifacts were recovered in 1987 and brought ashore in France; and the remainder of the Titanic Artifacts were recovered in subsequent years and brought ashore in the United States of America. Thus, conceptually, the Titanic Artifacts can be divided into two collections based on their initial point of arrival: the French Artifacts and the American Artifacts (both as defined below).

a.    The French Artifacts

In the summer of 1987, RMST's predecessor-in-interest, TVLP, and the Institut Francais de Recherche Pour l'Exploitation de la Mer jointly conducted thirty-two (32) dives to the wreck of the *Titanic*, from which the parties recovered approximately 2,100 artifacts (the "**French Artifacts**"). After recovering the French Artifacts, the parties brought them to France for restoration and conservation.

Approximately five (5) years later, TVLP sought title to the French Artifacts from the French Office of Maritime Affairs. On October 20, 1993, an Administrator in the French Office of Maritime Affairs executed a *proces-verbal*, pursuant to which TVLP was awarded title to the French Artifacts.

b.    The American Artifacts

In June 1993, RMST (as successor-in-interest to TVLP) conducted fifteen (15) dives to the *Titanic* wreck site and recovered approximately 800 artifacts, all of which were brought to Norfolk, Virginia. On August 26, 1993, RMST commenced an *in rem* proceeding in the Admiralty Court against both the artifacts recovered in the 1993 expedition and the wreck itself. *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 323 F. Supp. 2d 724, 728 (E.D. Va. 2004). As a result of this action, the Admiralty Court issued an order on June 7, 1994, awarding to RMST the status of exclusive salvor-in-possession of the *Titanic* wreck and wreck site. *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 286 F.3d 194, 197 (4th Cir. 2002) (quoting the 1994 order). Pursuant to its status as salvor-in-possession, RMST conducted additional expeditions to the *Titanic* in 1994, 1996, 1998, 2004, and 2010, from which it recovered the balance of the Artifacts (in addition to the Artifacts recovered in 1993, the "**American Artifacts**").[4]

In late 2007, RMST filed a *Motion for a Salvage Award* in the Admiralty Court seeking compensation – a salvage award – for its efforts in salvaging the *Titanic* wreck site. Three years later, the Admiralty Court determined that RMST was entitled to a salvage award of one hundred percent (100%) of the value of the American Artifacts. *See R.M.S. Titanic v. Wrecked & Abandoned Vessel, its Engines, Tackle, Apparel, Appurtenances, Cargo, etc.*, 742 F. Supp. 2d 784, 809 (E.D. Va. 2010). The Admiralty Court, however, reserved remittance of the award until it could determine the appropriate method of payment – either the proceeds of a judicial sale of the American Artifacts or by awarding RMST title to the American Artifacts.[5]

---

[4] For the avoidance of doubt, the American Artifacts consist of all Titanic Artifacts that are <u>not</u> the French Artifacts.

[5] Due to complexities of maritime law not at issue here, RMST's status of salvor-in-possession (which it obtained in the summer of 1994) did not grant to RMST title to the American Artifacts. *See generally R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 435 F.3d 521 (4th Cir. 2006).

In 2011, the Admiralty Court determined that the salvage award should be paid in-kind and awarded to RMST title to the American Artifacts. The award (and RMST's title), however, was conditioned upon compliance with certain *Revised Covenants and Conditions* annexed as Exhibit A to the August 12, 2010 order (the "**Covenants and Conditions**"). Among other things, the Covenants and Conditions limit RMST's ability to dispose of the American Artifacts and provide the Admiralty Court with continuing jurisdiction over the American Artifacts.

c.      The Covenants and Conditions

The Covenants and Conditions limit RMST's ability to sell the American Artifacts individually or as a collection. Specifically, the Covenants and conditions require that the American Artifacts "be kept together and intact forever, pursuant to the terms of the [Covenants and Conditions]." Covenants and Conditions § III.A. The terms of the Covenants and Conditions allow for the sale of individual artifacts in the American Collection only under limited circumstances. In addition, the Covenants and Conditions place further requirements on the American Artifacts that make a traditional sale or auction of the Titanic Artifacts – that is, the entire collection – difficult. For example, the Covenants and Conditions require that the Titanic Artifacts be made available for public display and exhibition, historical review, and research. *Id.* at § III.B. The Covenants and Conditions also place strict conservation, curation, and management requirements on the Titanic Artifacts – including substantive and procedural requirements for the care and transfer of the American Artifacts to any subsequent caretaker. *Id.* at §§ IV, V. Finally, the Covenants and Conditions appoint the National Oceanic and Atmospheric Administration ("**NOAA**") in an oversight role to, among other things, ensure adherence to the Covenants and Conditions. *Id.* at § V.

**D.    Prepetition Capital Structure.**

As of the Petition Date, the Debtors owed approximately $3,000,000 in aggregate principal amount pursuant to the following: (i) the Revised and Restated Secured Promissory Note and Guarantee issued by PRXI to Lange Feng ("**Feng**") on March 24, 2016 in the principal amount of $1,000,000; (ii) the Revised and Restated Secured Promissory Note and Guarantee issued by PRXI to Jihe Zhang ("**Zhang**") on March 24, 2016 in the principal amount of $1,000,000; and (iii) the Revised and Restated Secured Promissory Note and Guarantee issued by PRXI to Haiping Zou ("**Zou**" and, together with Feng and Zhang, the "**Secured Lenders**") on March 24, 2016 in the principal amount of $1,000,000 (collectively, the "**Secured Lender Notes**"). The Secured Lenders asserted liens on substantially all assets of PRXI, PEM, RMST, and Premier Merch on account of the Secured Lender Notes.

**E.    Corporate Governance and Management.**

**1.    Current Board of Directors**

PRXI's board of directors is composed of the following individuals:

- Daoping Bao
- Rich Kraniak
- Mark Bains

- 10 -

- • Douglas Banker
- • Guo "David" Ding
- • Sid Dutchak

2. **Executive Officers**

The executive officers of PRXI are:

- • Daoping Bao: Executive Chairman, President, and Chief Executive Officer of PRXI since November 2, 2015.
- • Jerome Henshall: Chief Financial Officer.  Mr. Henshall was named CFO on July 21, 2016.
- • Jessica Sanders: Vice President, Corporate Affairs and Corporate Secretary.  Ms. Sanders has been with PRXI since October 24, 2007.

F.     **Key Event Leading to the Filing of These Chapter 11 Cases**

On April 9, 2014, PRXI and 417 Fifth Ave Real Estate LLC ("**Fifth Ave**") entered into that certain *Standard Form of Office Lease* (as subsequently amended, the "**NY Lease**") for non-residential real property located at 417 Fifth Avenue, New York, New York (the "**NY Premises**"). The NY Lease was for a term of approximately ten (10) years and ten (10) months, and total rent due under the term of the NY Lease equaled approximately $37.69 million ("**Base Rent**").  The Debtors entered into the NY Lease to house and showcase their Saturday Night Live exhibition, an immersive experience featuring the characters, stories, programs, cast, and creators of "Saturday Night Live" (the "**SNL Exhibition**").

Due to the nature of the SNL Exhibition and the existing layout of the Premises, the Debtors determined that the Premises would require substantial alteration to house the SNL Exhibition. Accordingly, the Debtors and Fifth Ave agreed to a "**Construction Allowance**" – up to $5,500,000.00 payable from Fifth Ave to third-party contractors for certain "hard costs" related to the Debtors' improvement and alteration of the Premises.  Pursuant to the NY Lease, the Construction Allowance accrued interest at a rate of twelve percent (12%) per annum and was due and payable as "Additional Amortized Rent" in one hundred twenty (120) equal monthly installments of $78,909.09.  Thus, the Debtors' total monthly obligations under the NY Lease equaled approximately $350,000.00 ("**Monthly Rent**").

The Debtors completed the required alterations and began presenting the SNL Exhibition in May 2015.  Given the prime location of the Premises – and the subject matter of the SNL Exhibition – the Debtors projected revenue in excess of their Monthly Rent obligations. Unfortunately, realized profits for the SNL Exhibition were well-below the Debtors' projections, and the Debtors were forced to close the SNL Exhibition just over one (1) year later, in June 2016. At this point, the Monthly Rent had become a critical drain on the Debtors' finances.  Accordingly, after closing the SNL Exhibition, the Debtors attempted to negotiate a termination of the burdensome NY Lease.

The Debtors and Fifth Ave, however, were unable to reach a consensual resolution of the termination of the NY Lease.  Thereafter, on June 14, 2016, the Debtors filed these Chapter 11

Cases to stay any collection activities by Fifth Ave and to reject the NY Lease.

## III.
## THESE CHAPTER 11 CASES

**A.     The Debtors' Post-Petition Financial Performance.**

Since the Petition Date, the Debtors have operated their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Summaries of the Debtors' post-petition financial performance are filed on a monthly basis with the Bankruptcy Court pursuant to the Operating Guidelines and Reporting Requirements for Debtors in Possession and Chapter 11 Trustees for Region 21 (the "**Monthly Operating Reports**"). The Monthly Operating Reports are available from the Office of the Clerk of the U.S. Bankruptcy Court for the Middle District of Florida and are also available online at PACER.

**B.     "First Day" and Other Initial Orders.**

On the Petition Date, the Debtors filed a number of customary "first day" motions seeking approval of certain orders to facilitate the transition between the Debtors' pre- and post-petition business operations. Broadly, the motions sought authorization for the Debtors to continue with certain regular business practices that may not be specifically authorized under the Bankruptcy Code, or for which the Bankruptcy Code requires prior court approval. In greater detail, the first day orders in these Chapter 11 Cases authorized, among other things, the following: (i) the joint administration of these Chapter 11 Cases (under *In re: RMS Titanic, Inc.*; Case No. 3:16-bk-02230); (ii) the payment of pre-petition wages, salaries, and benefits for employees; (iii) the continued use of the Debtors' existing cash management system, bank accounts, and business forms; and (iv) the continued use of certain customer programs.

The Debtors obtained additional orders during the initial stage of the Chapter 11 Cases to: (i) retain Professionals; (ii) retain and pay ordinary course professionals without separate retention and fee applications; (iii) establish the procedures by which court-approved Professionals could obtain interim compensation and reimbursement pending the filing of interim and final fee applications; (iv) extend the time by which the Debtors were required to file their Schedules and Statements (as defined below); and (v) secure the use of cash collateral.

Pursuant to an Order dated May 15, 2019 [D.E. 72] (the "**Interim Fee Vacatur Order**"), the Bankruptcy Court vacated its prior Order permitting payment of Professional Compensation pending interim and final allowance thereof. Under the Interim Fee Vacatur Order, all remaining Professional Compensation Claims shall be held in abeyance until the conclusion of the Chapter 11 Cases and the D&O Litigation.

**C.     Retained Professionals.**

Following the Petition Date, the Bankruptcy Court authorized the Debtors to retain certain Professionals to represent them and assist them in connection with these Chapter 11 Cases. Specifically, the Debtors retained, with the Bankruptcy Court's approval, the following Professionals: (i) Nelson Mullins Riley & Scarborough LLP, as bankruptcy co-counsel; (ii)

- 12 -

Troutman Sanders LLP, as bankruptcy co-counsel; (iii) Kaleo Legal, as special litigation counsel, outside general counsel, securities counsel, and conflicts counsel; (iv) McGuire Woods LLP, as special litigation counsel; (v) GlassRatner Advisory & Capital Group LLC, as financial advisors and investment bankers; and (vi) Carr, Riggs & Ingram, LLC as tax advisors.

## D.   Schedules and Statements.

On July 15, 2016, each of the Debtors filed their respective (i) Schedules of Assets and Liabilities and schedule of Executory Contracts and Unexpired Leases and (ii) Statements of Financial Affairs (collectively, and as subsequently amended or supplemented, the "**Schedules and Statements**").[6]  The Schedules and Statements contain basic information about the Debtors and their liabilities, including, among other things, schedules of the Debtors' trade creditors.

## E.   Official Committees.

### 1.   Official Committee of Unsecured Creditors

On August 24, 2016, the US Trustee appointed the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") pursuant to Bankruptcy Code section 1102(a)(1).  The Creditors' Committee currently is comprised of the following three (3) members: (i) TSX Operating Co., LLC; (ii) Dallian Hoffen Biotechnique Co., Ltd.; and (iii) B.E. Capital Management.  With the approval of the Bankruptcy Court, the Creditors' Committee has retained the following Professionals: (i) Thames Markey & Heekin, P.A., as co-counsel; and (ii) Storch Amini PC, as co-counsel.

### 2.   Official Committee of Equity Security Holders

On August 24, 2016, the US Trustee appointed an Official Committee of Equity Security Holders of Premier Exhibitions, Inc. (the "**Equity Committee**" and, together with the Creditors' Committee, the "**Committees**") pursuant to Bankruptcy Code section 1102(a)(1).  Until February 6, 2019, the Equity Committee was comprised of the following members: (i) Jonathan Heller; (ii) Lawndale Capital Management, LLC.; (iii) Ian Jacobs; (iv) ACK Investments, LLC; and (v) Frank Gerber.  With the approval of the Bankruptcy Court, the Equity Committee retained the following Professionals: (i) Landau Gottfried & Berger LLP, as co-counsel; (ii) Akerman LLP, as co-counsel; (iii) Lincoln Partners Advisors LLC, as financial advisors; and (iv) Teneo Securities LLC, as financial advisors.  On January 25, 2019 the Bankruptcy Court entered an agreed order [Adversary Proceeding; Docket No. 25] (the "**Responsible Person Order**") appointing Mark C. Healy as substitute plaintiff in the D&O Litigation (defined below) after which the Equity Committee was disbanded.[7]  On February 6, 2019, the United States Trustee disbanded the Equity Committee, effective as of that date.  *See Notice of Disbanding Official Committee of Equity Security Holders* [Docket No. 1311].

---

[6] Throughout the course of these Chapter 11 Cases the Debtors have had to amend and supplement their various schedules on numerous occasions.  *See, e.g.*, [Docket Nos. 17, 18, 32, 30, 38, 38, 90, 97, 172, 173, 201; Case No. 3:16-02230].

[7] As discussed herein, upon the Confirmation of the Plan and the execution of the Liquidating Trust Agreement, all rights in the D&O Litigation shall vest in the Liquidating Trust.

F.     **Bar Date.**

On July 12, 2016, the Bankruptcy Court set October 24, 2016 as the deadline for creditors to file proofs of claims (the "**Bar Date**") against each of the Debtors.  *See* [Docket No. 83].

G.     **Post-Petition Financing.**

1.     **Cash Collateral**

On December 7, 2016, the Debtors sought to utilize cash collateral (on which the Secured Lenders contended they had a valid lien) *nunc pro tunc* to the Petition Date for, among other things, the payment of (i) the Debtors' ongoing operating expenses and (ii) the payment of Professionals [Docket No. 370] (the "**Cash Collateral Motion**").  The Bankruptcy Court granted the Cash Collateral Motion in part, denying *nunc pro tunc* relief but permitting the use of cash collateral through and including March 31, 2017 [Docket No. 431] (the "**Cash Collateral Order**").  Under the terms of the Cash Collateral Order, the Secured Lenders are granted a replacement lien on all of their alleged cash collateral to the same extent, validity, and priority as the security interests asserted by the Secured Lenders as of the Petition Date.

2.     **DIP Financing**

On May 18, 2017, the Debtors entered into a post-petition financing agreement with Bay Point Capital Partners LP (the "**DIP Lender**") to obtain a multi-tranche loan (the "**DIP Loan**") in the aggregate principal amount not to exceed $5,000,000.00 to fund the Debtors' business and ongoing administrative costs.  The Bankruptcy Court approved the DIP Loan by order dated June 29, 2017 [Docket No. 650] (the "**DIP Order**").  Pursuant to the DIP Order, the DIP Lender was granted (i) allowed superpriority administrative expense claims under Bankruptcy Code section and (ii) post-petition, first-priority security interests in and priming liens on substantially all of the Debtors' assets (not including the Titanic Artifacts) for the Debtors' obligations under the DIP Loan.  On May 29, 2018, the Debtors exercised an extension option extending the maturity date of the DIP Loan for one year to June 29, 2019.  The DIP Loan was paid in full on February 13, 2019 in connection with the Sale and from the proceeds thereof.

H.     **KERP/KEIP Motion and Order.**

On July 26, 2017, the Debtors filed a motion [Docket No. 683] (the "**KERP/KEIP Motion**") pursuant to which the Debtors sought authority to implement and enter into a Key Employee Retention Plan and a Key Employee Incentive Plan (each as defined therein).  The Court granted the KERP/KEIP Motion by Order dated September 13, 2017 [Docket No. 746] (as later amended on September 20, 2017 [Docket No. 746]) (the "**KERP/KEIP Order**").  Among other things, the KERP/KEIP Order authorized, as an administrative expense, a lumpsum payment to certain individuals if a "Complete Sale Transaction" (as defined therein) occurred within one year of the "Effective Date" (as defined therein) of the proposed Key Employee Incentive Plan.

The Purchase Agreement fell within the meaning of a "Complete Sale Transaction." Accordingly, the Debtors have remitted part of the lumpsum payment due under the terms of the Key Employee Incentive Plan, as authorized by the KERP/KEIP Order, and will remit the

remainder once the Plan has gone Effective. Importantly, this payment is already accounted for in the Class 2 distribution estimation set forth in § I.D, *supra*.

## I.     Settlement of Certain Claims.

### 1.     James Beckman and Image Quest

On October 21, 2016, James Beckman and Image Quest Worldwide, Inc. ("**Image Quest**") filed proofs of claims asserting general unsecured claims against the Debtors in the aggregate amount of approximately $13.4 million (collectively, the "**Nevada Claims**"). The Nevada Claims arose out of certain counterclaims that Mr. Beckman and Image Quest asserted against PRXI in an action in Nevada state court. After attending mediation, the Debtors, Mr. Beckman, and Image Quest stipulated to an agreed resolution of the Nevada Claims, whereby Image Quest and Mr. Beckman would withdraw the Nevada Claims and the Debtors would dismiss with prejudice the action pending against Mr. Beckman and Image Quest in Nevada state court (the "**Nevada Claims Resolution**"). The Bankruptcy Court approved the Nevada Claims Resolution by order dated June 19, 2017. *See* [Docket No. 616].

### 2.     Fifth Ave

On October 24, 2016, Fifth Ave filed two proofs of claims (collectively, the "**Lease Claim**") against the Debtors, in the total amount of approximately $12.6 million, for damages arising out of the Debtors' rejection of the NY Lease. On February 13, 2017, the Debtors filed an objection to Fifth Ave's claim no. 30 [Docket No. 471], to which Fifth Ave. filed a response on February 28, 2017 [Docket No. 488]. Subsequently, on May 16, 2017, the Debtors filed their *Motion for Summary Judgment on Debtors' Objection to Claim No. 30 Filed by Fifth Ave Real Estate* [Docket No. 586]. The Debtors and Fifth Ave. thereafter exchanged discovery and agreed to mediate their dispute. Following mediation, the Debtors and Fifth Ave stipulated to an agreed resolution of the Lease Claim, reducing it to a $5.5 million allowed general unsecured claim and disallowing the remainder (the "**Lease Resolution**"). The Bankruptcy Court approved the Lease Resolution by order dated March 13, 2018. *See* [Docket No. 973].

### 3.     PacBridge Parties Settlement

This settlement is discussed below in Section S.3.

## J.     Attempts to Sell the Titanic Artifacts.

Cognizant of the value of the Titanic Artifacts, the Debtors entered into these Chapter 11 Cases with the original intent to liquidate a small number of the French Artifacts, thus providing the capital necessary to satisfy all claims and reorganize quickly. However, due to certain complications and after consultation with the Committees, the Debtors determined that a marketing and sale process for substantially all of their assets was in the best interests of the Debtors' Estates.

### 1.     Initial Attempt to Sell the French Artifacts

The Debtors first attempted to sell a subset of the French Artifacts on June 28, 2016, when

- 15 -

the Debtors moved the Bankruptcy Court for the entry of an order authorizing the sale of certain of the French Artifacts free and clear of any interests, claims, or liens [Docket No. 28] (the "**Initial Sale Motion**"). The Initial Sale Motion was motivated by, among other things, the Debtors' belief that the French Artifacts (or a portion thereof) would be easiest to sell because the Debtors held title to the French Artifacts free and clear – notwithstanding any residual interest of the French Republic a/k/a the Republic of France ("**France**") or the Covenants and Conditions.[8] Both NOAA[9] and the United States Trustee objected to the Initial Sale Motion, opposing it on several grounds, including: (1) that, to the extent France had an interest in the French Artifacts, the Debtors would have to determine that interest through an adversary proceeding, not a sale motion; and (2) RMST's title to the French Artifacts was subject to "its ability to keep the collections of artifacts together" – that is, subject to the Covenants and Conditions. [Docket No. 73] at ¶ 18. On July 22, 2016, the Bankruptcy Court entered an order [Docket No. 102] (the "**Initial Sale Order**") denying without prejudice the Initial Sale Motion and instructing the Debtors to determine via an adversary proceeding France's interest in the French Artifacts, if any.

a.    French Adversary

Consistent with the Initial Sale Order, on August 17, 2016, the Debtors filed an adversary proceeding against France entitled *RMS Titanic, Inc. v. French Republic a/k/a Republic of France* (AP. No. 3:16-ap-183-PMG) (the "**French Adversary**"). In the French Adversary, the Debtors sought a declaratory order determining that France did not have any interest in the French Artifacts. On September 29, 2017, the Bankruptcy Court entered a default judgment in favor of the Debtors, holding that France did not have any interest in the French Artifacts [French Adversary, Docket No. 67]. The French Adversary did not, however, address whether and to what extent the Covenants and Conditions applied to the French Artifacts; it adjudicated only France's rights with respect to the French Artifacts.

2.    **Contemplated Auction of the Titanic Artifacts**

In November 2016, the Debtors submitted a request for proposals to a variety of auction houses for the auction and sale of a portion or all of the Titanic Artifacts, to which Bonhams and Christie's responded. Following discussions with and a request from the Equity Committee, the Debtors circulated a revised request for proposals to a wider group of auction houses in January 2017 (the "**RFP**"), which contemplated an auction of any of the following: 1) the entire collection of the Titanic Artifacts (subject to the Covenants and Conditions); 2) the entire collection of the French Artifacts; or 3) a subset of the French Artifacts. In late February of 2017, the Debtors received a new proposal from Guernsey's and revised proposals from Bonhams and Christies.

The responses revealed significant hurdles in connection with the proposed auction. As an initial matter, each of the three respondents indicated that an evaluation and auction timeframe would likely last through most of 2017. Additionally, the respondents expressed significant concerns and reluctance to handle and sell the Titanic Artifacts, stemming largely from the

---

[8] The Initial Sale Motion explained that, while TVLP made assurances to the French government that it would not "carry out any commercial transaction concerning [the French Artifacts] nor any sale of any one of them," the *proces-verbal* transferred to RMST (as successor-in-interest to TVLP) unconditional title to the French Artifacts.

[9] Technically, the Department of Commerce filed the Initial Sale Objection; however, NOAA is a sub-agency of the Department of Commerce.

Covenants and Conditions and the corresponding litigation exposure. The Court also received informal objections from several members of the international maritime community over the proposed auction of the Titanic Artifacts. *See* [Docket Nos. 435, 436].

Thus, after extensive negotiations and evaluations, the Debtors and the Committees determined that a sale of the Debtors' assets as a going concern – including the sale of the Titanic Artifacts as a whole collection – was in the best interests of the Debtors and their estates. Accordingly, in April of 2017, the RFP was suspended and, shortly thereafter, the Debtors and the Committees entered into that certain *Plan Support Agreement*, dated as of May 18, 2017 [Docket No. 587-1] (the "**PSA**"), which was approved by the Court on July 6, 2017 [Docket No. 642].

3.       **The PSA and the PacBridge Offer**

Among other things, the PSA provided that the Debtors, with the support of the Committees, would conduct a process to market and sell either (or both) the entire Titanic Artifact collection or the operations/exhibitions of PRXI and its subsidiaries, the proceeds of which were to fund a chapter 11 plan of liquidation. As required by the PSA, the Debtors (through GlassRatner) marketed the Debtors' assets to potential purchasers over several months. GlassRatner conducted an extensive and far-reaching marketing campaign, contacting potential buyers and interested parties (as identified through independent research and Debtor and Committee contacts) across the globe. In addition, Kekst (a reputable PR firm) conducted a national campaign to uncover and reach other potential buyers. As a product of these efforts, news of the sale of the Titanic Artifacts reached a global audience – the proposed sale was featured on the Today Show, national television nightly news programs, and newspapers worldwide.

In or about October 2017, these marketing efforts succeeded in yielding a significant – approximately $30 million – offer from PacBridge Capital Partners (HK) Ltd. ("**PacBridge**") for the purchase of substantially all of the Debtors' assets (the "**PacBridge Offer**").[10] The PacBridge Offer had a high certainty of closing and would have provided sufficient funds to pay creditors in full and allow shareholders to retain their equity. Unfortunately, however, PacBridge withdrew the PacBridge Offer in late October 2017 after the Equity Committee leveled allegations of misconduct between PacBridge and the Debtors' management – allegations that ultimately were determined by the Debtors to be untrue.

4.       **The "Naked Auction"**

Despite receiving expressions of interest from other interested buyers, a definitive agreement with a stalking horse bidder never materialized on the time table originally agreed upon by the Debtors and the Committees under the PSA. Nonetheless, the Debtors and the Committees initially determined to proceed toward an auction of substantially all of the Debtors' assets without a stalking horse bidder and filed a motion to approve such a "naked auction" process on November 14, 2017 [Docket No. 811] (the "**Auction Motion**").

---

[10] In addition to the PacBridge Offer, the Debtors received an offer from the Armada Group GP, Inc. (the "**Armada Offer**") and an offer from a group of foreign investors (the "**Loongs Offer**"). The Armada Offer was a complicated reverse triangular merger that was difficult, if not impossible, to value; and the Loongs Offer never materialized into anything more than a tentative offer.

On December 12, 2017, an ad hoc group of equity holders (the "**Ad Hoc Group**") comprised of funds managed by affiliates Apollo and Alta filed an objection to the Auction Motion, requesting that they be given time to conduct diligence on the Debtors to formulate a restructuring alternative to the Auction Motion. *See* [Docket No. 850]. On December 14, 2017, the Trustees of the National Maritime Museum ("**NMM**") filed a motion to withdraw the reference[11] with respect to the Auction Motion, and to transfer it to the Admiralty Court. *See* [Docket No. 853]. Because of these objections, the interest of the Ad Hoc Group in pursuing restructuring alternative, and other considerations, the Debtors, with the support of the Committees, withdrew the Auction Motion on December 15, 2017 [Docket No. 863].

**K.      Mediation.**

Given the posture of these Chapter 11 Cases (as of late 2017), along with the various and competing interests of the Debtors' constituents and stakeholders, on February 25 and 26, 2018, representatives of the Debtors, the Committees, NOAA, the DIP Lender, the Secured Lenders, the Ad Hoc Group, and other major constituents in the cases convened for a mediation to attempt to reach agreement on the best path forward to exit these Chapter 11 Cases (the "**Mediation**"). The Mediation parties did not reach an ultimate, formal resolution; however, the parties agreed that the continued pursuit of a sale transaction was in the best interests of the Debtors and their estates. *See* [Docket No. 970].

**L.      Extension of Exclusivity; Expiration.**

By several orders, the Bankruptcy Court extended the period in which the Debtors exclusively could file a plan through December 14, 2017, and the date through which the Debtors could gain acceptance of the plan through February 14, 2018. *See* [Docket Nos. 308, 418, 633, 740, 828]. Ultimately, however, exclusivity expired before the Debtors were able to file a plan.

**M.      Trustee Motion.**

On May 1, 2018, Euclid Claims Recovery LLC ("**Euclid**"), a creditor of the Debtors by virtue of the purchase of a claim, filed a *Motion of Euclid Claims Recovery LLC for Appointment of Chapter 11 Trustee* [Docket No. 1013] (the "**Trustee Motion**"). In the Trustee Motion, Euclid sought the appointment of a Chapter 11 trustee, alleging principally that the relief was warranted because the Debtors had failed to materially advance a successful sale of their assets since the Petition Date. The Debtors, the Creditors' Committee, and the Equity Committee all objected to the Trustee Motion [Docket Nos. 1046, 1048, 1049]. After a hearing on June 7, 2018, the Bankruptcy Court denied the Trustee Motion by order dated June 29, 2018. *See* [Docket No. 1082].

---

[11] District courts have original jurisdiction over bankruptcy matters; however, district courts have 'standing orders of reference' by which they automatically 'refer' bankruptcy matters to the bankruptcy court for that district. A motion to withdraw the reference seeks to remove from the bankruptcy court all or part of a bankruptcy matter and, instead, have it heard by the district court.

38680380

N.      **D&O Litigation.**

On May 25, 2018, the Bankruptcy Court entered an order [Docket No. 1036] over the objections of the Debtors and the Creditors' Committee [Docket Nos. 1029, 1038] granting the Equity Committee derivative standing to pursue certain claims and causes of action against current and former officers and directors of PRXI. Additionally, the Bankruptcy Court approved the Equity Committee's retention of Robert Charbonneau, Esq. of Agentis PLLC as Special Litigation Counsel in connection with Equity Committee's prosecution of the claims. *See* [Docket No. 1038]. Thereafter, the Equity Committee commenced an adversary proceeding entitled *Official Committee of Equity Security Holders v. Mark A. Sellers, et al.*, AP. No. 3:18-ap-00064-PMG (the "**D&O Litigation**") asserting breach of fiduciary duty and gross negligence claims against Mark A. Sellers, Douglas Banker, Richard Kraniak, Jack H. Jacobs, Daoping Bao, Sellers Capital, LLC, and Sellers Capital Master Fund, Ltd. The D&O Litigation is still pending and is one of the Causes of Action that will be transferred to the Liquidating Trust under the Plan.

O.      **Purchase Agreement; Competing Plans.**

Notwithstanding the expiration of exclusivity, the Debtors continued to search for a buyer of substantially all of the Debtors' assets – consistent with the PSA and the Mediation. In June 2018, however, it became clear that the Debtors and the Committees had starkly different views on the best exit from these Chapter 11 Cases. Indeed, by the end of June, the Debtors, the Equity Committee, and the Creditors' Committee each had moved for separate, competing, and mutually exclusive proposals, which, among other things, delayed the ultimate resolution of these Chapter 11 Cases.

1.      **EC Plan**

On June 1, 2018, the Equity Committee filed a *Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders of Premier Exhibitions, Inc.* [Docket No. 1045] (as later amended, the "**EC Plan**") and accompanying disclosure statement [Docket No. 1044] (as later amended, the "**EC Disclosure**"). As a general matter, the EC Plan provided for the sale of the American Artifacts as an entire collection and the piecemeal sale of the French Artifacts through auction at Guernsey's and for the liquidation of the Debtors. The Debtors objected to the EC Plan and EC Disclosure, arguing, among other things, that the EC Plan was not feasible and that the EC Disclosure failed to provide adequate information. *See* [Docket No. 1119]. The Debtors' objection was joined by the Ad Hoc Equity Group, PacBridge, and the Secured Lenders. *See* [Docket Nos. 1123, 1127]. In addition, NOAA filed an objection to the EC Disclosure, noting that it failed to provide adequate information about the "material and substantial litigation risk" attendant to the proposed sale of the Titanic Artifacts. *See* [Docket No. 1120].

2.      **Purchase Agreement**

Fewer than two weeks later, the Debtors executed that certain *Asset Purchase Agreement* dated as of June 14, 2018 (as subsequently amended, the "**Purchase Agreement**") by and among

- 19 -

the Debtors and DinoKing,[12] as sellers, and Premier Acquisition, as buyer.  Premier Acquisition is an entity formed by the Secured Lenders, PacBridge, and affiliates of the Ad Hoc Group.  The Purchase Agreement resulted from a wide-reaching and thorough marketing and sale process conducted by the Debtors, through GlassRatner, over a period of approximately one year.  In connection with that process, the Debtors contacted over 150 parties and signed over 30 non-disclosure agreements with parties who were sent information packages and provided registered access to its diligence data room.

The Purchase Agreement provided for, among other things, a sale of substantially all of the Debtors' assets (including 100% of the stock in RMST and the Debtors' exhibitions business assets) to Premier Acquisition, as follows: a transfer of 100% of the stock of RMST (which owns the rights to the Titanic Artifacts), the free and clear sale of the Debtors' other assets and business, and the sale of DinoKing's assets (collectively, and as defined in the Purchase Agreement, the "**Transferred Assets**").  As consideration for the Transferred Assets, Premier Acquisition agreed to pay to the Debtors $17,500,000.00 in cash (subsequently increased to $19,500,000.00), subject to certain adjustments at closing (the "**Purchase Price**"), and the assumption of certain liabilities as set forth in the Purchase Agreement.  The transaction contemplated by the Purchase Agreement was subject to be subject to higher and better offers at auction.

On June 15, 2018, the Debtors moved the Court [Docket No. 1055] (the "**Sale Motion**") for entry of an order approving, among other things, the form of the Purchase Agreement and the proposed bidding procedures for the auction (as defined in the Sale Motion, the "**Bidding Procedures**").  The Creditors' Committee, Equity Committee, and Euclid filed objections to the Sale Motion.  *See* [Docket Nos. 1168, 1169, 1170].  The objections, in large part, were variations on the same two arguments – that the Purchase Agreement was unduly influenced by insiders, and that the Bidding Procedures would stifle competitive bidding.  As discussed below, the Bankruptcy Court ultimately determined these arguments to be without merit, and the objections were overruled.

3.    **CC Plan**

Approximately two weeks after the Debtors filed the Sale Motion, the Creditors' Committee filed a *Joint Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors, the Trustees of the National Maritime Museum, the Board of Trustees of National Museums and Galleries of Northern Ireland, and Running Subway Productions LLC* [Docket No. 1085] (as subsequently amended, the "**CC Plan**") and accompanying disclosure statement [Docket No. 1084] (as subsequently amended, the "**CC Disclosure**").  In short, the CC Plan provided for a private sale of the Titanic Artifacts to NMM and the sale of the Debtors' exhibition business to Running Subway Productions LLC, a competitor of the Debtors.  Facially, the consideration for this transaction was $19.2 million, which was higher than the Purchase Price under the Purchase Agreement annexed to the Sale Motion ($17,500,000, subject to adjustment); however, the CC Plan contained a financing contingency and provided that funds constituting the purchase price would be raised through a fundraising campaign.  The Debtors objected to the CC

---

[12] DinoKing Tech Inc. d/b/a Dinosaurs Unearthed is a non-debtor herein and is the wholly-owned subsidiary of 102403 B.C. Ltd. ("**ExchangeCo**"), a company formed under the laws of British Columbia, and a non-debtor herein.  In turn, ExchangeCo is the wholly-owned subsidiary of PRXI.

Plan and the CC Disclosure on the grounds that, among other things, the CC Plan was not financially feasible, the CC Disclosure failed to disclose certain information about possible insider transactions, and it did not adequately inform the reader of the proposed financing arrangement. *See* [Docket No. 1121]. The Debtors' objection was joined by the Ad Hoc Equity Group, PacBridge, and the Secured Lenders. *See* [Docket Nos. 1124, 1126]. The Creditors' Committee withdrew its support for the CC Plan after the Purchase Price under the Purchase Agreement was increased to $19,500,000 as described above.

### 4.    **Abatement of Initial Hearing**

Initially, each of the three proposals – the Sale Motion, the EC Disclosure, and the CC Disclosure – were set for hearing on July 25, 2018 (the "**Initial Hearing**"). *See* [Docket Nos. 1058, 1060, 1096]. However, on July 6, 2018, the various plan sponsors of the CC Plan moved the Bankruptcy Court to abate the Initial Hearing and, instead, to hold a status conference to discuss, among other things, the propriety of an "inter-court" protocol (between the Bankruptcy Court and the Admiralty Court) and a joint solicitation of the Purchase Agreement, EC Plan, and CC Plan. *See* [Docket No. 1099]. After conducting a status conference on July 25, 2018, the Court entered an order [Docket No. 1147], which: (i) declined to establish an "inter-court" protocol; (ii) denied joint solicitation of the Purchase Agreement, EC Plan, and CC Plan; (iii) reset the Sale Motion, EC Disclosure, and CC Disclosure for hearing on August 30, 2018 (the "**Omnibus Hearing**").

### 5.    **Outcome of Omnibus Hearing**

After conducting the Omnibus Hearing, at which the Bankruptcy Court considered the Sale Motion, EC Disclosure, CC Disclosure, and all objections, responses, and replies thereto, *e.g.* [Docket Nos. 1175, 1183, 1191], the Bankruptcy Court entered an order [Docket No. 1199] (the "**Omnibus Order**"): (i) approving the Debtors' plan to sell substantially all of their assets via section 363 of the Bankruptcy Code, (ii) denying approval of the EC Disclosure "because it d[id] not support a plan that is confirmable," and (iii) holding in abeyance the CC Disclosure (on request from the CC Plan sponsors). Shortly thereafter, the Bankruptcy Court entered an order [Docket No. 1201] (the "**Bidding Procedures Order**") approving, among other things, the Debtors' Bidding Procedures and scheduling a final hearing to consider approval of the results of the sale.

## P.    **Cancellation of Auction and Designation of PAHL as Winning Bidder.**

In accordance with the Omnibus Order and the Bidding Procedures Order, the Debtors proceeded to solicit bids higher and better than the Purchase Agreement for substantially all of their assets, with the Purchase Agreement to serve as the bidding floor. The Debtors, however, did not receive any bids on or before the deadline of October 5, 2018. The Debtors, therefore, cancelled the auction (as provided in the Bidding Procedures and Bidding Procedures Order) and designated Premier Acquisition as the winning bidder with the Purchase Agreement as the winning bid. *See* [Docket No. 1226].

**Q.**    **Approval of Sale to Premier Acquisition.**

1.    **Bankruptcy Court Approval**

After designating Premier Acquisition as the winning bidder, the Debtors sought the Bankruptcy Court's approval of the sale to Premier Acquisition under the Purchase Agreement. The Equity Committee filed an objection to the sale [Docket No. 1225] (the "**EC Objection**"), alleging certain procedural deficiencies and arguing that Premier Acquisition should not be entitled to the "good faith" protections of section 363(m) of the Bankruptcy Code. The Debtors responded [Docket No. 1229] to the EC Objection, noting that the Bankruptcy Code did not support the procedural aspect of the EC Objection and that the "good faith" portion of the EC Objection was an improper attempt to relitigate an issue already resolved against the Equity Committee at the Omnibus Hearing. On October 19, 2018, the Bankruptcy Court entered an order [Docket No. 1232] (the "**Sale Order**") approving, among other things, the sale to Premier Acquisition under the Purchase Agreement and overruling the EC Objection.

2.    **Admiralty Court Approval**

Pursuant to § 5.2(a) of the Purchase Agreement, the Debtors were required to seek the Admiralty Court's approval of the sale and transfer contemplated by the Purchase Agreement (with respect to RMST's stock) prior to closing the transaction. Accordingly, on June 28, 2018, the Debtors filed with the Admiralty Court *Plaintiff's Motion to Approve Asset Purchase Agreement and Memorandum in Support* [Admiralty Court; Docket Nos. 448, 449] (the "**Admiralty Sale Motion**"). Following entry of the Sale Order, the Admiralty Court heard the Admiralty Sale Motion and RMST's proposed order thereon on October 25, 2018. As a result of questions raised by the Admiralty Court at the October 25, 2018 hearing, RMST worked diligently for several months to address the Admiralty Court's issues, which included providing NOAA with documents and written responses to various questions and working with NOAA and Premier Acquisition on the agreed terms of a revised proposed order approving the Admiralty Sale Motion. Following RMST's provision of additional documents and information, NOAA submitted to the Admiralty Court a supplemental status report recommending the Admiralty Court approve the Admiralty Sale Motion. *See* [Admiralty Court; Docket No. 530]. A continued hearing on the Admiralty Sale Motion was held on December 17, 2018, at which time the Admiralty Court took the matter under advisement. Subsequently, on December 21, 2018, the Admiralty Court entered an order [Admiralty Court; Docket No. 540] (the "**Admiralty Court Order**"), among other things, approving the sale and transfer of 100% of RMST's stock to Premier Acquisition, as contemplated by the Purchase Agreement. Thereafter, the transactions authorized by the Sale Order and the Admiralty Court Order were closed effective as of February 13, 2019 (the "Sale Closing Date"). See *Notice of Closing of Sale of Substantially All of the Debtors' Assets and Amendment to Asset Purchase Agreement*, filed on February 19, 2019 [Docket No. 1319].

**R.**    **Impact of the Approval Process.**

As set forth in the Sale Motion, the Purchase Agreement required the Debtors to obtain entry of certain orders of the Bankruptcy Court and Admiralty Court by definitive deadlines. Specifically, the Purchase Agreement required the Debtors to obtain entry of an order approving the Bidding Procedures by July 20, 2018; entry of the Sale Order on or before August 17, 2018;

and entry of the Admiralty Order on or before September 7, 2018.

Those targeted milestones were considerably delayed for two primary reasons. First, competing proposals filed by the Committees, discussed above, resulted in significant litigation over the best strategy to move the Debtors' Chapter 11 Cases forward toward a successful resolution, including a delay of over a month between the Initial Hearing and the Omnibus Hearing. Second, consideration of the Admiralty Sale Motion was continued for nearly two months after the initial October 25, 2018 hearing in order to address concerns raised by NOAA and the Admiralty Court, during which time the Debtors and Premier Acquisition exchanged substantial diligence information and documents with NOAA, negotiated the terms of a revised proposed order granting the Admiralty Sale Motion, and Premier Acquisition intervened in the Admiralty Case.

The delays associated with obtaining the requisite court approvals and closing the Sale affected the estimated distribution to unsecured creditors in two principal ways. First, the Debtors incurred approximately 3 months of additional administrative expenses not anticipated at the time of the Omnibus Hearing. Second, the delayed closing of the Sale occurred at a time when the Debtors' financial performance was seasonally lower than the estimated closing date when the Purchase Agreement was executed – which, among other things, adjusted downward the Purchase Price remitted (as set forth below). Consequently, the estimated distribution to Holders of Unsecured Claims has decreased from 80% that was approximated by the Debtor's financial advisor at the time of the Omnibus Hearing to a current approximation of 63.5%.

**S.      Central Elements of Purchase Agreement as It Relates to the Plan.**

1.      **Transferred Assets**

The Debtors have sold and transferred substantially all of their assets to Premier Acquisition pursuant to the Purchase Agreement and the Sale Order. As set forth above, the Purchase Agreement provided for: (i) a free and clear sale of substantially all of the Debtors' assets (including their exhibition business); (ii) a sale of 100% of the stock of RMST; and (iii) the sale of substantially all of Dinoking's assets.

The Transferred Assets do not include avoidance actions other than certain claims against affiliates of Premier Acquisition and claims against counterparties to Assumed and Assigned Contracts (as such term is defined in the Purchase Agreement) and critical vendors.

2.      **Purchase Price**

The purchase price for the Transferred Assets was $19,500,000.00 subject to certain adjustments at Closing. Due to the unforeseen and substantial delay between the execution of the Purchase Agreement and the closing of the Sale, the Debtors' "Final Current Assets" (as such term is defined in the Purchase Agreement) were less than the "Estimated Current Assets" (as such term is defined in the Purchase Agreement), by approximately $800,000 (the "**Adjustment Shortfall Amount**," as such term is defined in the Purchase Agreement). Accordingly, Premier Acquisition claimed the right to reduce, on a dollar-for-dollar basis, the Purchase Price by the Adjustment Shortfall Amount pursuant to § 2.4(d) of the Purchase Agreement. After deducting from the

- 23 -

contractual purchase price the Adjustment Shortfall Amount and certain third-party payments contemplated and provided for under the Purchase Agreement (including payment at Closing of the following: (i) certain taxes and fees associated with the sale of certain assets and required to be paid by the sellers under the Purchase Agreement, (ii) the DIP Loan, (iii) the PacBridge Settlement, (iv) the Debtors' director and officer insurance tail policy premium, and (v) the success fee due GlassRatner as a result of the Closing of the Sale), the total cash consideration for the Transferred Assets received by the Debtors after closing adjustments was approximately $11,582,000 (the "**Sale Proceeds**"), exclusive of certain liabilities of the Debtors assumed by Premier Acquisition pursuant to the terms of the Purchase Agreement.

3.      **PacBridge Parties Settlement**

The Purchase Agreement provided for the settlement of the claims asserted by the Debtors' Secured Lenders and PacBridge. As set forth above, the Secured Lenders have asserted secured claims against the Debtors in the aggregate principal amount of $3,000,000.00 (the "**Secured Lenders' Claims**"). PacBridge has asserted $1,195,350.39 as an unsecured claim against certain of the Debtors for financial advisory services arising out of the DinoKing-PRXI merger in 2015 (the "**PacBridge Claim**"). In full and final settlement of the Secured Lenders' Claims and the PacBridge Claim, the Purchase Agreement provided for (as follows, the "**PacBridge Parties Settlement**"): (i) $1 million cash to the Secured Lenders at closing; plus (ii) allowed general unsecured claims against the Debtors in the aggregate amount of $2,000,000.00, to be allocated $666,666.67 to Feng, $666,666.67 to Zhang, and $666,666.66 to Zou; and (iii) PacBridge to receive an allowed general unsecured claim against the Debtors in the amount of $1,195,350.39. The PacBridge Parties Settlement was approved as part of the Sale Order.

4.      **Dismissal of RMST**

Because Premier Acquisition purchased 100% of the stock of RMST, the Purchase Agreement and Sale Order provided for the dismissal of RMST as a chapter 11 debtor after the closing of the Sale. Thus, Premier Acquisition acquired RMST subject to the claims of RMST's creditors whose claims were not resolved while RMST was a debtor in the Chapter 11 Cases. *See Order Dismissing Chapter 11 Case of Debtor RMS Titanic, Inc. and Amending Order Granting Motion for Joint Administration of Chapter 11 Cases*, filed on March 8, 2019 [Docket No. 1336].

5.      **Post-Closing Services Agreement**

In connection with the Sale, PRXI and Premier Acquisition executed that certain Post-Closing Services Agreement (the "**Post-Closing Agreement**") whereby Premier Acquisition authorized certain officers or employees of the Debtors to continue providing certain services to the Debtors on a limited basis, including, but not limited to, remaining as an officer of PRXI in their pre-Sale capacity and assisting with the preparation and confirmation of the Debtors' Plan and accompanying Disclosure Statement. Consistent with the Post-Closing Agreement, Jessica Sanders, Jerry Henshall, and Alice Sisavanh executed letter agreements with the Debtors whereby they agreed to continue serving in their respective pre-Sale roles and provide certain services to the Debtors as requested, but no more than approximately 10 hours per week during the Term of the letter agreement (as defined therein), for which the Debtors agreed to provide compensation at the hourly rates of $70, $100, and $70, respectively.

- 24 -

# IV.
# CLASSIFICATION OF CLAIMS AND INTERESTS

## A.    Introduction.

The following is a summary of the Plan.  This overview is qualified in its entirety by reference to the provisions of the Plan.  In accordance with Section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Expense Claims and Allowed Priority Tax Claims are not classified under the Plan.  All other Claims and Interests in the Case are classified as shown below.  The Plan provides that holders of Allowed Claims in certain classes will be entitled to a distribution of Cash.  Notwithstanding any provision of the Plan, a Claim in a particular Class is entitled to receive Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and only to the extent such Claim has not been paid, released, or otherwise satisfied prior to the Effective Date.

## B.    Classifications.

The Plan divides all classified Claims and Interests into the following Classes, which shall be mutually exclusive:

| | |
|---|---|
| Class 1: | Class 1 shall consist of Allowed Priority Claims. |
| Class 2: | Class 2 shall consist of Allowed Unsecured Claims. |
| Class 3: | Class 3 shall consist of PRXI Equity Interests. |
| Class 4: | Class 4 shall consist of Subsidiary Equity Interests. |

# V.
# DESCRIPTION OF CLAIMS AND TREATMENT UNDER THE PLAN

Claims and Interests, as well as their treatment and an analysis of whether they are classified or unclassified and Impaired or Unimpaired, are described as follows:

## A.    Unclassified Claims.

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including Professional Compensation Claims) and Priority Tax Claims have not been classified in the Plan.  The treatment accorded to Allowed Administrative Expense Claims and Allowed Priority Tax Claims is set forth in Article 4 of the Plan.

### 1.    Administrative Expense Claims

Except as otherwise provided in Section 3.1.3 of the Plan (and, to the extent applicable, the Fee Order) with respect to Professional Compensation Claims, on or before the later to occur of (i) the Effective Date and (ii) the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable, each Holder of an Allowed Administrative Expense Claim shall be paid in full, in Cash in an amount equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the

Bankruptcy Code. Notwithstanding the foregoing, each Holder of an Allowed Administrative Expense Claim may be paid (a) on such other terms as may be agreed upon by the Holder of such Allowed Administrative Expense Claim and the Liquidating Trustee or (b) as otherwise ordered by a Final Order of the Bankruptcy Court.

      2.    **Priority Tax Claims**

The Liquidating Trustee will pay all Allowed Priority Tax Claims in Cash in full on the Effective Date or as soon thereafter as is reasonably practicable, but in no event later than the end of five (5) years from the Petition Date. As to any Allowed Priority Tax Claim not paid in full on the Effective Date, the Holder of such Allowed Priority Tax Claim shall receive on account of such Allowed Priority Tax Claim regular quarterly installment payments in Cash in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code through and including the date such Allowed Priority Tax Claim is paid in full. Holders of Allowed Priority Tax Claims shall receive interest on account of their Allowed Priority Tax Claims at the Section 6621 Interest Rate; provided, however, that if the Holder of such Allowed Priority Tax Claim is a city, county or state, such Holder shall receive interest on account of its Allowed Priority Tax Claim at the applicable statutory rate under state law. To the extent that any Allowed Priority Tax Claim is allowed after the Effective Date, it will be paid in full in Cash as soon after allowance as is reasonably practicable over a period no later than the end of five (5) years from the Petition Date, including interest as calculated above.

**B.    <u>Unimpaired Class of Claims.</u>**

The following Class of Claims is Unimpaired; therefore, under 11 U.S.C. § 1126(f), it will be presumed conclusively to have accepted the Plan.

      1.    **Class 1: Priority Claims**

Each Holder of an Allowed Priority Claim designated in Class 1 shall be paid as follows:

      a.    In full, in cash, on or before the later of the Effective Date or, if any Claim in Class 1 were a Disputed Claim and thereafter became Allowed Priority Claim, immediately following the date upon which such Claim became an Allowed Priority Claim, or as soon as reasonably practicable thereafter; or

      b.    Upon such other terms as may be agreed to between the Liquidating Trustee and a Holder of an Allowed Priority Claim.

Class 1 is Unimpaired by the Plan. Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

**C.    <u>Impaired Classes of Claims and Interests.</u>**

The following classes of Claims and Interests are Impaired.

1.      **Class 2: Unsecured Claims**

Class 2 consists of all Allowed Unsecured Claims.  As soon as is reasonably practicable following the Effective Date, as determined by the Liquidating Trustee in his or her sole discretion, each Holder of an Allowed Unsecured Claim shall receive its Pro Rata Share of the Net Distributable Assets.  Holders of Allowed Unsecured Claims are not entitled to receive any payment of Cash on account of their Allowed Unsecured Claims until the payment and satisfaction of all Allowed Claims in Class 1.

Class 2 is Impaired under the Plan.  Holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

2.      **Class 3: PRXI Equity Interests**

Class 3 consists of all Equity Interests in PRXI.  On the Effective Date, all PRXI Equity Interests shall be cancelled as set forth in Section 7.5 of the Plan.  Holders of PRXI Equity Interests shall receive no Distribution and retain no Assets on account of such Interests.

Because Holders of Equity Interests in Class 3 do not retain any property under the Plan on account of such Equity Interests, Class 3 is deemed to have rejected the Plan under the provisions of section 1126(g) of the Bankruptcy Code.  Accordingly, Holders of Class 3 Interests are not entitled to vote to accept or reject the Plan.

3.      **Class 4: Subsidiary Equity Interests**

Class 4 consists of all Subsidiary Equity Interests.  On the Effective Date, all Subsidiary Equity Interests shall be canceled as set forth in Section 7.5 of the Plan.  Holders of Subsidiary Equity Interests shall receive no Distribution and retain no Assets on account of such Interests.

Because Holders of Subsidiary Equity Interests in Class 4 do not retain any property under the Plan on account of such Equity Interests, Class 4 is deemed to have rejected the Plan under the provisions of section 1126(g) of the Bankruptcy Code.  Accordingly, Holders of Class 4 Interests are not entitled to vote to accept or reject the Plan.

# VI.
# MEANS FOR IMPLEMENTATION

A.      **Limited Consolidation.**

Entry of the Confirmation Order shall constitute the approval, pursuant to Section 105(a) of the Bankruptcy Code, of the limited consolidation as of the Effective Date and as of such date, (i) all Assets and Liabilities of the Debtors will be deemed to be merged into PRXI (as set forth above, the Consolidated Debtors) solely for purposes of the Plan, the Confirmation of the Plan and Distributions to be made thereunder, (ii) the obligations of each Debtor will be deemed to be the obligation of the Consolidated Debtors solely for purposes of the Plan, the Confirmation of the Plan  and Distributions thereunder, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the Consolidated Debtors and all Claims filed against more than one Debtor

- 27 -

for the same liability shall be deemed one Claim against any obligation of the Consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the limited consolidation of the Assets and Liabilities of the Debtors, (v) all transfers, disbursements and Distributions made by any Debtor hereunder on Allowed Claims and will be deemed to be made by the Consolidated Debtors, (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several Liability of any of the Debtors shall be deemed to be one obligation of the Consolidated Debtors, and (vii) no Distributions shall be made under the Plan on account of Intercompany Claims and all such Intercompany Claims shall be eliminated.

Substantive consolidation is an equitable remedy that has the effect of creating "one common pool of assets, liabilities and a single body of creditors, while extinguishing the intercorporate liabilities of the consolidated estates." *White v. Creditors Serv. Corp. (In re Credit Serv. Corp.)*, 195 B.R. 680, 689 (Bankr. S.D. Ohio 1996); *In re Bonham*, 229 F.3d 750, 764 (9th Cir. 2000). Its primary purpose is to promote the equitable treatment of all creditors. *Eastgroup Props. v. Southern Motel Assoc., Ltd.*, 935 F.2d 245, 248 (11th Cir. 1991). Because substantive consolidation is an equitable doctrine, relief can be granted in varying forms in order to "square with the facts of each case", and it "is therefore impossible to define for all cases the results of substantive consolidation." *See In re DeltaCorp, Inc. (Moran v. Hong Kong & Shanghai Banking Corp.)*, 179 B.R. 773, 777, at fn. 5 (S.D. N.Y. 1995); *see also In re Giller (First Nat'l Bank of El Dorado v. Giller)*, 962 F.2d 796, 799 (8th Cir. 1992) ("[T]he bankruptcy court retains the power to order a less complete consolidation.").

The Debtors strongly believe that partial substantive consolidation, also referred to as limited consolidation, of the Debtors and their respective bankruptcy estates as proposed under the Plan will reflect the economic reality of the Debtors' true operational and financial structure. Although courts have not consistently articulated tests for anything less than substantive consolidation, the applicable legal standard for substantive consolidation has been well defined by the courts.

To establish a *prima facie* case for substantive consolidation, a party must demonstrate that (i) there is a substantial identity between the entities to be consolidated; and (ii) consolidation is necessary to avoid some harm or to realize some benefit. *Eastgroup Props. v. Southern Motel Assocs. Ltd.*, 935 F.2d 245, 249 (11th Cir. 1991). Factors considered by courts to determine whether substantive consolidation is appropriate include:

      (i) presence or absence of consolidated financial statements;

      (ii) unity of interests and ownership between the various corporate entities;

      (iii) existence of parent and inter-corporate guarantees on loans;

      (iv) degree of difficulty in segregating and ascertaining individual assets and liabilities;

- 28 -

(v) existence of transfers of assets without formal observance of corporate formalities;

(vi) commingling of assets and business functions; and

(vii) profitability of consolidation at a single physical location.

*Id. See also Holywell Corp. v. Bank of New York*, 59 B.R. 340, 347 (S.D. Fla. 1986). Once a *prima facie* case for substantive consolidation is made, a presumption arises that creditors have not relied solely upon the credit of individual debtor entities. The burden then shifts to an objecting creditor to show that: (i) it has relied on the separate credit of one of the entities to be consolidated; and (ii) it will be prejudiced by substantive consolidation. *Eastgroup*, 935 F.2d at 249. Even if the objecting creditor meets this burden, the Bankruptcy Court may still order substantive consolidation if the benefits of such relief heavily outweigh the harm. *Id.*

The Debtors believe that limited consolidation of the Debtors' separate Estates is warranted and appropriate in these cases because (i) there is a strong unity of interest and ownership between these Debtors because they were all controlled by the same group of officers, directors and members; and (ii) a failure to consolidate the cases might unfairly favor one group of similarly situated creditors over others. In reality, the Debtors were consolidated prior to the Bankruptcy Case in both operation and corporate structure.

Based on the foregoing, the Debtors believe that the facts of this case establish a *prima facie* case for limited consolidation under the *Eastgroup* test. Indeed, the Debtors believe that limited consolidation is the only way to deal fairly with their creditors and, as such, limited consolidation is a condition precedent to Confirmation of the Plan. For these reasons, limited consolidation is both desirable and necessary. Limited consolidation will also facilitate and expedite the administration of the Debtors' Estates by eliminating duplicative or inconsistent efforts on the part of the various estates with respect to claims administration and asset recovery.

Notwithstanding the foregoing, such limited consolidation under the Plan shall not affect (a) any obligations under any contracts or leases that were entered into during the Chapter 11 Cases or Executory Contracts or Unexpired Leases that will be (or have been) assumed and assigned pursuant to the Purchase Agreement, (b) distributions from any insurance policies or proceeds of such policies, or (c) guarantees that are required to be maintained post-Effective Date (i) in connection with Executory Contracts or Unexpired Leases that were entered into during the Chapter 11 Cases or that have been, or will hereunder be, assumed and assigned, or (ii) pursuant to the express terms of the Plan. The limited consolidation proposed by the Plan shall not affect each Debtor's obligation to file the necessary operating reports and pay the U.S. Trustee Fees. Such obligations shall continue until a Final Order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case.

## B.   Creation of Liquidating Trust.

On the Effective Date, the Liquidating Trust shall be created for the benefit of the Liquidating Trust Beneficiaries. The Liquidating Trust shall be governed by the Liquidating Trust

Agreement, the Plan and the Confirmation Order. A copy of the Liquidating Trust Agreement is attached to the Plan as Exhibit A. The primary purpose of the Liquidating Trust will be to distribute the Debtors' Assets (specifically including the Sale Proceeds) to the Liquidating Trust Beneficiaries, to collect and distribute any other assets and proceeds, and to prosecute any Causes of Action, including the D&O Litigation. The initial Liquidating Trustee shall be Mark Healy of Michael Moecker & Associates LLC.

## C.      Transfer and Vesting of Assets to the Liquidating Trust.

On the Effective Date, all Assets, including all Cash and Causes of Action, shall be deemed to have automatically been transferred to and shall vest in the Liquidating Trust. All transfers to the Liquidating Trust shall be free and clear of all liens, claims, interests and encumbrances, except as otherwise set forth in the Plan. For the avoidance of doubt, nothing herein shall be construed to restrict or limit the ability or standing of the Liquidating Trustee to assert any Causes of Action transferred to the Liquidating Trust. In connection with any Causes of Action, any attorney-client privilege, work-product privilege or protection, or other privilege or immunity attaching to any documents or communications thereto (whether written or oral) will also exist for the benefit of the Liquidating Trust and will vest in the Liquidating Trustee and his or her representatives and will also be preserved for and as to the Debtors. The Liquidating Trustee is authorized to take all necessary actions to benefit from such privileges. For federal income tax purposes, the transfer of the Assets to the Liquidating Trust will be deemed to be a transfer to the Holders of Allowed Claims (who are the Liquidating Trust Beneficiaries), followed by a deemed transfer by such Liquidating Trust Beneficiaries to the Liquidating Trust.

## D.      Treatment of Liquidating Trust for Federal Income Tax Purposes; No Successor-in-Interest.

The Liquidating Trust will be established for the primary purpose of liquidating the Liquidating Trust Assets, in accordance with Treasury Regulation § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee will, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, make timely distributions to the Liquidating Trust Beneficiaries in accordance with the Plan and the Liquidating Trust Agreement and not unduly prolong its duration. The Liquidating Trust will not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Liquidating Trust Agreement.

The Liquidating Trust is intended to be treated as a "liquidating trust" pursuant to Treasury Regulation § 301.7701-4(d) and as a "grantor trust" for federal income tax purposes, pursuant to Section 671 through 679 of the Internal Revenue Code of 1986, as amended (the "**IRC**"). In the event that the Liquidating Trust shall fail or cease to qualify as a liquidating trust in accordance with Treasury Regulations § 301.7701-4(d), the Liquidating Trustee shall take such action as he or she shall deem appropriate to have the Liquidating Trust classified as a partnership for federal tax purposes under Treasury Regulations § 301.7701-3 (but not a publicly traded partnership within the meaning of Section 7704 of the IRC), including, if necessary, creating or converting it into a limited partnership or limited liability company that is so classified. For federal income tax

- 30 -

purposes, the Liquidating Trust Beneficiaries will be treated as the grantors and owners of the Liquidating Trust and, therefore, will be responsible for the payment of tax on their respective allocable share of the taxable income of the Liquidating Trust.

As soon as reasonably practicable after the Effective Date, the Liquidating Trustee (to the extent that the Liquidating Trustee deems it necessary or appropriate in his or her sole discretion) will value the Liquidating Trust Assets based on the good faith determination of the value of such Liquidating Trust Assets. The valuation will be used consistently by all parties (including the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) for all federal income tax purposes. The Bankruptcy Court will resolve any dispute regarding the valuation of the Liquidating Trust Assets. The right and power of the Liquidating Trustee to invest the Liquidating Trust Assets transferred to the Liquidating Trust, the proceeds thereof, or any income earned by the Liquidating Trust, will be limited to the right and power to invest such Liquidating Trust Assets pending distributions in accordance with the Plan.

## E.    Rights and Obligations of the Liquidating Trustee.

The Liquidating Trustee shall have the rights, duties and obligations set forth in the Liquidating Trust Agreement and the Plan. Such rights, duties and obligations include, but are not limited to, exercising control and authority over the Liquidating Trust Assets and responsibility for liquidating and administering (or abandoning, as the case may be) the Liquidating Trust Assets and taking actions on behalf of, and representing, the Liquidating Trust. The Liquidating Trustee shall be the representative of the Estates as contemplated by Section 1123(b)(3)(B) of the Bankruptcy Code. The Liquidating Trustee shall have the rights and powers of a trustee appointed under Sections 702 and 1104 of the Bankruptcy Code to act on behalf of the Estates and the Liquidating Trust with regard to the administration of the Cases and the Property of the Estates and the Liquidating Trust. The Liquidating Trustee shall have the authority to bind the Liquidating Trust within the limitations set forth in the Liquidating Trust Agreement, the Plan and the Confirmation Order, but shall for all purposes hereunder be acting in the capacity of Liquidating Trustee and not individually. Within the limitations set forth in the Liquidating Trust Agreement and subject to the provisions of the Plan, the responsibilities and authority of the Liquidating Trustee, shall include, without limitation: (a) the making of Distributions to Holders of Allowed Claims as contemplated in the Plan; (b) establishing and maintaining a Disputed Claims Reserve to be determined in accordance with Section 7.4.2 of the Plan; (c) conducting an analysis of Claims not already allowed by prior order of the Court, and prosecuting objections thereto or settling or otherwise compromising such Claims if necessary and appropriate in accordance with the Plan; (d) filing appropriate tax returns with respect to the Liquidating Trust in the exercise of its fiduciary obligations; (e) retaining any Professionals to assist with the Liquidating Trustees duties; (f) taking such actions as are necessary to prosecute, resolve or compromise, as appropriate, all Causes of Action assigned to the Liquidating Trust; (g) taking such actions as are necessary and reasonable to carry out the purposes of the Liquidating Trust; (h) opening, closing and maintaining new or existing bank accounts, letters of credit and other financial instruments; (i) taking such actions as are necessary and reasonable to carry out the purposes of the Liquidating Trust; and (j) filing (or causing to be filed) any documents necessary to effect the dissolution of each of the Debtors immediately upon the Effective Date and the execution of the Liquidating Trust Agreement.

**F.**     **Post-Confirmation Report of Liquidating Trust.**

The Liquidating Trustee shall file all required post-confirmation operating reports through the date the Cases are closed.

**G.**     **Dissolution of Liquidating Trust.**

The Liquidating Trust will be dissolved no later than three years from the Effective Date unless the Bankruptcy Court, upon a motion filed prior to the third anniversary or the end of any extension period approved by the Bankruptcy Court (the filing of which will automatically extend the term of the Liquidating Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or opinion letter that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.  After (a) the final Distribution of the Disputed Claims Reserve Account and the balance of the Liquidating Trust Assets pursuant to the Plan, and (b) the filing by or on behalf of the Liquidating Trust of a certification of dissolution with the Bankruptcy Court in accordance with the Plan, the Liquidating Trust will be deemed dissolved for all purposes without the necessity for any other or further actions.

**H.**     **The Committees and the Liquidating Trust Oversight Committee.**

On the Effective Date, the Creditors' Committee will be dissolved[13] and the Liquidating Trust Oversight Committee will be formed to serve as an advisory board to the Liquidating Trustee. The Liquidating Trust Oversight Committee will assume the rights and obligations set forth in the Plan and the Liquidating Trust Agreement.  Each member of the Liquidating Trust Oversight Committee must hold, at all times throughout their service on the Liquidating Trust Oversight Committee, an Unsecured Claim against the Estate (or be the legal nominee or designee of a holder of an Unsecured Claim against the Estate).  Any member that sells all of its Unsecured Claim against the Estate shall be immediately removed from the Liquidating Trust Oversight Committee. The purchaser of an Unsecured Claim from a member of the Liquidating Trust Oversight Committee shall not automatically succeed to the member's position on the Liquidating Trust Oversight Committee by reason of the purchase of the Unsecured Claim but may be appointed pursuant to the bylaws of the Liquidating Trust Oversight Committee.  A member's rights of membership on the Liquidating Trust Oversight Committee may not be transferred to or otherwise be assigned or delegated to another person or entity without the express consent of the Liquidating Trust Oversight Committee.

**I.**     **Further Transactions.**

The Liquidating Trustee shall be authorized to execute, deliver, file, and/or record such contracts, instruments, releases, indentures, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  To facilitate the liquidation and distribution of the Estates and the wind-

---

[13] The Equity Committee has already been dissolved.  *See* Section III.E.2, *supra*.

up of the Debtors' affairs, on the Effective Date the Liquidating Trustee shall be deemed, by operation of law and the Confirmation Order and without need for any action by any person affiliated with the Debtors or any officer or director of the Debtors, to hold an irrevocable power of attorney on behalf of the Debtors and the Estates and with respect to all assets of the Debtors and the Estates.

**J.      Administration of Claims.**

From and after the Effective Date, the Liquidating Trustee shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment all objections to Claims. As of the Effective Date, the Liquidating Trustee shall be deemed to be substituted for the Debtors and succeed to all rights and defenses of the Debtors, with respect to any objections to Claims that have not been finally resolved prior to the Effective Date. Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, pursuant to the Confirmation Order, all objections to Claims shall be filed with the Bankruptcy Court by no later than one hundred and eighty days following the Confirmation Date (unless such period is extended by the Bankruptcy Court upon motion of the Liquidating Trustee). Objections to late-filed Claims and Claims resulting from the rejection of Executory Contracts or Unexpired Leases shall be filed on the later of (a) one hundred and eighty days following the Confirmation Date and (b) the date that is ninety days after the Liquidating Trustee receives actual notice of the filing of such Claim.

Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Cases, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and Distribution. Prior to the Effective Date, the Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Liquidating Trustee, as appropriate, may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. The determination of Claims in any hearings of this Bankruptcy Court to determine or estimate the value of any Claims, as provided by Bankruptcy Rule 3018(a) or otherwise, shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and Distribution. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific estimation hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

The Liquidating Trustee shall take actions regarding the administration, reconciliation and

- 33 -

settlement of Claims, and shall object to Claims and prosecute Claims actions, until such time as the Liquidating Trustee determines that further pursuit of litigation or actions objecting to Claims is no longer cost efficient and will be of no further benefit to the Estates and their creditors. **THE FAILURE TO OBJECT TO ANY CLAIM PRIOR TO THE COMMENCEMENT OF THE HEARING ON CONFIRMATION OF THE PLAN SHALL NOT BE DEEMED TO BE A WAIVER OF THE RIGHT TO OBJECT THEREAFTER TO SUCH CLAIM IN WHOLE OR IN PART FOR THE PURPOSE OF DISTRIBUTION**.

## K.     Preservation of Rights of Action.

Except as otherwise expressly provided in the Plan, any rights or Causes of Action accruing to or held by the Debtors or their Estates prior to the Effective Date shall be deemed Assets of, and vest in, the Liquidating Trust on the Effective Date. For the avoidance of doubt, the D&O Litigation shall be an Asset of, and vest in, the Liquidating Trust on the Effective Date. The Liquidating Trustee may pursue those Causes of Action, as deemed appropriate. The Plan, Disclosure Statement and Schedules do not set forth an exhaustive list of all Causes of Action preserved under the Plan and vesting in the Liquidating Trust and the failure to identify or list any particular Cause of Action therein shall not constitute a waiver or release of such Cause of Action. **ALL CAUSES OF ACTION NOT EXPRESSLY SOLD OR RELEASED UNDER THE PURCHASE AGREEMENT AND SALE ORDER, OR RELEASED OR WAIVED IN THE PLAN OR THE CONFIRMATION ORDER, SHALL SURVIVE CONFIRMATION, AND THE ASSERTION OF CAUSES OF ACTION SHALL NOT BE BARRED OR LIMITED BY ANY ESTOPPEL, WHETHER JUDICIAL, EQUITABLE OR OTHERWISE.**

## VII.
## DISTRIBUTIONS TO HOLDERS OF CLAIMS

## A.     Date of Distributions.

As soon as is reasonably practicable following the Effective Date, as determined by the Liquidating Trustee in his or her sole discretion, the Liquidating Trustee shall use the Liquidation Trust Assets and/or the Net Distributable Assets, as applicable, to make Distributions with respect to Allowed Claims in Class 1 and 2, as and to the extent provided for in the Plan or as ordered by the Court. Subsequent to the Effective Date, the Liquidating Trustee shall use the Liquidation Trust Assets and/or the Net Distributable Assets, as applicable, to make Distributions, on each Distribution Date or as soon thereafter as is reasonably practicable, with respect to Allowed Claims as contemplated by and to the extent set forth in the Plan. The Liquidating Trustee shall continue to make Distributions out of the Net Distributable Assets up to and including the Consummation Date, on which date the Liquidating Trustee will make the final Distribution under the Plan.

## B.     Address for Distributions.

All Cash payments required to be made under the Plan will be sent to Holders of Allowed Claims at the addresses listed in the Debtors' Schedules or stated in any Proof of Claim filed by a Holder of a Claim or to such other address as the Holder of a Claim shall provide in writing to the Liquidating Trustee. The proceeds of any payment properly sent to the Holder of an Allowed Claim but returned because of unknown or insufficient address, and the proceeds of any check not

- 34 -

cashed within ninety days of sending will become property of the Liquidating Trust, and the rights of the original payee shall be extinguished. Return of mail by the United States Post Office as "undeliverable and without forwarding address" shall be conclusive evidence of an attempt to deliver to the address shown. If any Distribution or other payment to the Holder of an Allowed Claim under the Plan is returned for lack of a current address for the Holder or otherwise (as such, an "**Undeliverable Distribution**"), the Liquidating Trustee shall file with the Bankruptcy Court the name, if known, and last known address of the Holder and the reason for its inability to make payment. If, after the passage of 90 days, the attempted Distribution remains an Undeliverable Distribution, the Liquidating Trustee shall distribute to the Holders of Allowed Claims in the appropriate Class the amount of the Undeliverable Distribution, and the Allowed Claim giving rise to the Undeliverable Distribution shall be deemed satisfied and released, with no recourse to the Liquidating Trust, the Liquidating Trustee or the Liquidating Trust Assets, to the same extent as if the Undeliverable Distribution had been made to the corresponding Holder of the Allowed Claim.

## C.    Payments by Cash.

All payments made pursuant to the Plan shall be in Cash and by any means reasonably selected by the Liquidating Trustee, as applicable, including check, wire transfer or by ACH. If a Cash payment to be received by any Holder of an Allowed Claim in Class 2 on any Distribution Date (except the final Distribution) would be $100 or less in the aggregate, notwithstanding any contrary provision of the Plan, in the Liquidating Trustee's sole discretion, no such payment will be made to such Holder, and such Cash, if applicable, shall be held for such Holder until the next Distribution Date, at which time such Cash payment shall be made to the Holder. The Liquidating Trustee shall include an additional amount in the Disputed Claims Reserve Account for unpaid Distributions resulting from such undistributable small amounts.

## D.    Rounding.

Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole cent.

## E.    No Interest on Claims.

Except as provided in a Final Order entered in these Cases or as provided in Article 4 of the Plan, (a) no holder of any Claim shall be entitled to interest accruing on or after the Petition Date on such Claim, and (b) interest shall not accrue or be paid upon any Disputed Claim with respect to the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim, or any part thereof, becomes an Allowed Claim.

## F.    One Distribution Per Holder.

If the Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of Distribution hereunder, and only one Distribution shall be made with respect to the single aggregated Claim. Further, to the extent a Holder of a Claim has filed Proofs of Claim, each representing one single Claim, against multiple Debtors, such Holder of a Claim shall only be entitled to a single Distribution in full satisfaction of such Claim.

**G.**     **Effect of Preconfirmation Distributions.**

Nothing in the Plan shall be deemed to entitle the Holder of a Claim that received, prior to the Effective Date, full or partial payment of such Holder's Claim, by way of settlement or otherwise, pursuant to a Final Order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan; and all such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying the obligations of the Debtors or the Liquidating Trustee to such Holder under the Plan.

**H.**     **Disputed Claims.**

Notwithstanding any other provisions of the Plan, no payments or other Distribution of any kind will be made on account of any Claim until such Claim becomes an Allowed Claim and then only to the extent that such Claim is an Allowed Claim. The Liquidating Trustee shall establish and maintain the Disputed Claims Reserve Account sufficient to fund Disputed Claims that may subsequently become Allowed Claims, as determined by the Liquidating Trustee's prudent judgment. To the extent a Disputed Claim becomes an Allowed Claim after any initial Distributions, a Distribution as calculated above shall be made in respect of such Allowed Claim, but only to the extent necessary to equal the percent previously distributed to other Holders of Allowed Claims, within the timeframes prescribed by Section 7.3 of the Plan after such claim becomes an Allowed Claim by Final Order of the Bankruptcy Court. Notwithstanding the foregoing, any holder of both an Allowed Claim(s) and a Disputed Claim(s) shall receive the appropriate payment or Distribution on the Allowed Claim(s), although, except as otherwise agreed by the Liquidating Trustee in its sole discretion, no payment or distribution shall be made on the Disputed Claim(s) until such dispute is resolved by settlement or Final Order. Should any Holder of a Disputed Claim not assert a liquidated amount which can be used for purposes of the Liquidating Trustee being able to make necessary and prudent reserves for such Claim, as necessary for making interim Distributions on account of Allowed Claims, the Liquidating Trustee may include a prudent amount in the Disputed Claims Reserve Account for such Claim or may request the Bankruptcy Court to estimate the amount of the Claim, either for purposes of (i) allowance, (ii) determining a maximum amount of such Claim, or (iii) otherwise the amount to reserve so as to enable the Liquidating Trustee to make the appropriate reserve to proceed with an interim Distribution. The Liquidating Trustee, in his or her sole discretion and as part of the reconciliation, objection, resolution and compromise of objected Claims, may agree to make a distribution in full to such Holder of a Disputed Claim as part of a compromise and resolution of such Disputed Claim. The Liquidating Trustee may reserve funds in addition to the total Disputed Claims to the extent the Liquidating Trustee deems such extra reserve to be prudent. To the extent that any Claim is estimated for any purpose other than for voting, then in no event will such Claim be Allowed in an amount greater than the estimated amount.

**I.**     **Procedures for Resolving Disputed Claims.**

Subsequent to the Effective Date, the Liquidating Trustee shall have the authority to settle and resolve a Disputed Claim that was originally asserted in an amount equal to or less than Two Hundred Fifty Thousand Dollars ($250,000.00) upon such terms and conditions as the Liquidating Trustee deems appropriate and in the best interests of the Estates. Any such compromise and

settlement shall be deemed final and binding upon all parties in interest in the Cases.  The Liquidating Trustee shall not have any obligation to provide notice to or file and serve pleadings upon any such parties in interest and shall not have any requirement to obtain Court approval in connection with compromising these Claims.

With respect to any Disputed Claim that was originally asserted in an amount that exceeds $250,000.00, the Liquidating Trustee shall have the authority to compromise and settle any such Claim on such terms as the Liquidating Trustee deems appropriate and in the best interests of the Estates, subject to the approval of the Liquidating Trust Oversight Committee pursuant to Section 6.3.3 of the Plan, by providing Designated Notice of any such proposed compromise and a reasonable opportunity to object thereto. If a party in interest files a written objection with the Court in the Chapter 11 Cases with respect to any proposed compromise of any Disputed Claim and serves a copy of said objection upon the Liquidating Trustee and his or her counsel, within twenty-one (21) days from the service of Designated Notice of the proposed compromise, then the Court shall schedule a hearing with respect to said objection. If no objection is timely filed and served, the Liquidating Trustee may compromise and settle any Disputed Claim without further authorization. The Liquidating Trustee may file motions which seek to compromise more than one Claim.

## VIII.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.    Rejection of Executory Contracts and Unexpired Leases; Approval.**

Except as otherwise set forth in Section 9.2 of the Plan, each Executory Contract and Unexpired Lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be deemed rejected pursuant to section 365 of the Bankruptcy Code, and written notice will be provided to each such counterparty of such deemed rejected contract or lease (together with a statement of the date by which any Proof of Claim must be filed).  Each such contract and lease will be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtors, their Estates and all parties in interest in the Chapter 11 Cases.

**B.    Claims under Rejected Executory Contracts and Unexpired Leases.**

Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any Executory Contract or Unexpired Lease by operation of the Plan must be filed with the Bankruptcy Court on or before the Rejection Objection Deadline or such Claim shall be forever barred and unenforceable against the Debtors, their Estates and the Liquidating Trust.  The Plan, the Confirmation Order and any other order of the Bankruptcy Court providing for the rejection of an Executory Contract or Unexpired Lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an Executory Contract or Unexpired Lease of the foregoing deadline for filing a Claim in connection therewith.  All Claims for damages from the rejection of an Executory Contract or Unexpired Lease, once fixed and liquidated by the Bankruptcy Court and determined to be

- 37 -

Allowed Claims, shall be Allowed Unsecured Claims in Class 2.

**C.** **Assumption and Assignment of Contracts.**

The Executory Contracts and Unexpired Leases set forth on Exhibit A of the *Notice of Assumption and Assignment of Executory Contract or Unexpired Lease* [Docket No. 1323] (the "**Assumed Contracts**") have been assumed by the Debtors and assigned to Premier Acquisition as of the Closing Date.

**D.** **Inclusiveness.**

Each Executory Contract and Unexpired Lease to be rejected pursuant to the terms of the Plan, and all Assumed Contracts, shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such Executory Contract, Unexpired Lease, or Assumed Contract.

## IX.
## CONDITIONS PRECEDENT TO THE EFFECTIVENESS OF PLAN

Each of the following conditions must occur and be satisfied on or before the Effective Date for the Plan to be effective on the Effective Date; provided, however, that the Debtors may agree to waive any one or more of the following conditions:

**A.** **Confirmation Order Must Be Entered.**

The Confirmation Order must have been signed by the Bankruptcy Court and duly entered on the docket for these Cases by the clerk of the Bankruptcy Court, in form and substance acceptable to the Debtors.

**B.** **Confirmation Order Must Not Be Stayed, Reversed, Modified or Amended.**

There must not be any stay in effect with respect to the Confirmation Order, and the Confirmation Order must not have been stayed, reversed, vacated on appeal, modified or amended in any material respects prior to the Effective Date without the written consent of the Debtors.

**C.** **Provisions of the Confirmation Order.**

The Confirmation Order shall provide for the releases, injunctions, and exculpation of the Persons provided for by Article 10 of the Plan;

**D.** **Appointment of Liquidating Trustee.**

Mark Healy or his designee shall have been appointed as Liquidating Trustee and shall have accepted to act in such capacity in accordance with the terms and conditions of the Plan;

38680380

### E.      All Plan Actions, Documents and Agreements Have Been Executed.

All actions, documents, and agreements necessary to implement and consummate the Plan shall have been affected or executed and binding on all parties thereto; and

### F.      All Necessary Approvals or Consents Have Been Obtained.

All governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

## X.
## VOTING ON THE PLAN AND THE CONFIRMATION PROCESS

### A.      Classes Entitled to Vote.

Only Holders of a Class 2 Unsecured Claim, as Holders of an Impaired Claim, are entitled to vote on the Plan.  Under Section 1124 of the Bankruptcy Code, a Class of Claims or Interests is "impaired" by the Plan if the legal, equitable or contractual rights attaching to the Claims or Interests of that Class are modified.  Modification for purposes of determining impairment, however, does not include the curing of defaults and the reinstating of maturity.

To have a Claim entitled to vote, a Creditor must have (1) timely filed a Proof of Claim or (2) if no Proof of Claim was filed, been listed in the Schedules as having a Claim that is not contingent, unliquidated or disputed.  If such a Claim was scheduled as contingent, unliquidated or disputed, and if the Holder thereof did/does not File proof of such Claim on or before the Bar Date, or if such Claim is the subject of an objection, such Holder does not have a Claim, entitled to vote, and will not participate in any Distributions under the Plan until such time as the Claim becomes an Allowed Claim.

The Claims and Interests of the Debtors are divided by the Plan into Classes 1 through 4.  The Claims in Class 1 are Unimpaired.  Consequently, the Holders of such Claims are conclusively presumed to have accepted the Plan and will not be entitled to vote on the Plan.  The Claims and Interests in Class 2 are Impaired and may vote on the Plan.  Holders of Class 3 PRXI Equity Interests and Class 4 Subsidiary Equity Interests will not receive or retain any Property or equity interest under the Plan on account of such Equity Interests, and, therefore, Classes 3 and 4 are deemed not to have accepted the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Accordingly, votes of Holders of Class 3 PRXI Equity Interests and Class 4 Subsidiary Equity Interests are not being solicited.

### B.      Impairment Controversies.

If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Class of Equity Interests, is Impaired under the Plan, such Claim, Equity Interest, or Class shall

- 39 -

be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or Equity Interest, or a particular Class of Claims or Class of Equity Interests, under the Plan.

**C.**     **Voting.**

         If a Claim is the subject of an objection or an adversary proceeding prior to the deadline for submission of votes and the Holder of the Claim has not filed a motion seeking relief under Rule 3018 of the Bankruptcy Rules, the Holder shall not be entitled to vote to accept or reject the Plan.

**D.**     **Voting Instructions.**

         As set forth more particularly in the Solicitation and Voting Procedures, each Holder of a Claim in Class 2 – the only voting Class – may cast its vote to accept or reject the Plan by completing, dating, signing and returning the Ballot accompanying this Disclosure Statement in accordance with either of the following methods of delivery:

         (i)     <u>Electronic Filing</u>:  You may file your ballot electronically by completing the following steps:

         (1)     Direct your browser to https://pacer.flmb.uscourts.gov/cmecf/ballots/submission.asp;

         (2)     Enter the name of the person submitting the ballot as [First Name Last Name] (*e.g.*, "Joe Smith");

         (3)     Enter the name of the creditor voting the ballot (if the creditor and submitter are the same, enter the same name in both fields);

         (4)     Enter "**3:16-bk-02232**" as the case number;

         (5)     Enter "**2**" as the class number;

         (6)     Enter the amount of your claim;

         (7)     Select the appropriate disposition for your ballot; and

         (8)     Upload an <u>original, signed</u> copy of this ballot.

         (ii)     <u>Physical Filing</u>:  If you are unwilling or unable to file your ballot electronically, you may file a physical copy with the Clerk of Court, located at:

300 North Hogan Street
Suite 3-150
Jacksonville, Florida 32202

         Ballots submitted by facsimile will not be accepted.  A Ballot shall not constitute a Proof of Claim or Proof of Interest or an amendment to a Proof of Claim or Proof of Interest.

- 40 -

If a Creditor in Class 2 needs additional Ballots, or did not receive a Ballot, please contact the Debtors' counsel, Troutman Sanders LLP, to the attention of the addressees set forth on the cover page of this Disclosure Statement, sufficiently in advance of the Voting Deadline to obtain the Ballot and file the Ballot before the Voting Deadline.

## E.    Requirements of Confirmation.

The Bankruptcy Court will confirm the Plan only if it determines that all of the requirements of the Bankruptcy Code have been met.  The Bankruptcy Code requires, among other things, that (i) the Plan be accepted by at least one Impaired Class, (ii) the Bankruptcy Court make a determination that the Plan is in the "best interests" of all Holders of Claims and Interests (that is, dissenting Creditors and Interest Holders will receive at least as much under the Plan as they would receive in a liquidation under Chapter 7 of the Bankruptcy Code), (iii) the Bankruptcy Court makes a determination that the Plan is feasible, and (iv) the Plan has classified Claims and Interests in a permissible manner.  To confirm the Plan, the Bankruptcy Court must find that all of these and certain other requirements have been met.  Thus, even if the requisite vote is achieved for each Impaired Class, the Bankruptcy Court must make independent findings regarding the Plan's conformity with these requirements of the Bankruptcy Code before it may confirm the Plan. Additionally, if the requisite vote will not be achieved for each Impaired Class, the Bankruptcy Court must also make independent findings regarding the Plan's conformity with the requirements of Section 1129(b) of the Bankruptcy Code. The various statutory requirements are discussed below.

### 1.    Acceptance by at Least One Impaired Class

In order for the Plan to be confirmed, the Plan must be accepted by at least one Impaired Class that is entitled to vote on the Plan.  A Class of Impaired Claims will have accepted the Plan if the Holders of at least two-thirds in amount and more than one-half in number of the Claims actually voting in the Class have accepted it.

### 2.    Best Interests Test

The Plan cannot be confirmed unless the Bankruptcy Court determines that the Plan is in the "best interests" of the Debtors' Creditors and Interest Holders.  The Plan will be deemed to have satisfied the "best interests" test if the Plan provides to each dissenting or nonvoting member of each Impaired Class a recovery that has a value that is at least equal to the distribution that such member would receive if the assets of the Debtors were liquidated on the Effective Date in a hypothetical case under Chapter 7 of the Bankruptcy Code by a Chapter 7 trustee.  If all members of an Impaired Class of Claims or Equity Interest Holders vote to accept the Plan, the "best interests" test does not apply with respect to that Class.

In applying the "best interests" test, the Bankruptcy Court would ascertain the hypothetical recoveries in a Chapter 7 liquidation to the Debtors' Creditors and Interest Holders. These hypothetical Chapter 7 liquidation recoveries would then be compared with the Distributions offered to each Impaired Class of Claims or Interests under the Plan to determine if the Plan satisfies the "best interests" test.

- 41 -

In applying the "best interests" test, it is likely that the Holders of Claims in Classes 2 through 4 in a hypothetical Chapter 7 case would not receive a recovery greater than such Claims and Interests as classified under the Plan.  As discussed in more detail in Article V and XIII of this Disclosure Statement, the Debtors' analysis indicates that Confirmation of the Plan will provide each Creditor and Interest Holder holding a Claim or Interest in an Impaired Class with a recovery that is at least equal to the recovery that such Creditor or Interest Holder would receive pursuant to a liquidation and distribution of the Assets under Chapter 7 of the Bankruptcy Code.

Among other things, a liquidation under Chapter 7 would result in disruption, uncertainty, and delay almost certainly diminishing the value of the Debtors' remaining assets, as the layer of expense occasioned by the appointment of a Chapter 7 Trustee would be more than what is estimated by the Liquidating Trustee under the Plan continuing to retain the Professionals and consultants who are already familiar with the Claims and other issues facing the Debtors. Additionally, conversion of the Chapter 11 Cases to Chapter 7 would result in the Bar Date being reset, and otherwise late Claims being treated as timely.  As a result, this potentially could enlarge the number of Allowed Claims (thereby decreasing the amount of Distributions to current Holders of Allowed Claims).

3.        **Feasibility of the Plan**

For the Plan to be confirmed, the Bankruptcy Court must determine that the Plan is feasible; that is, as a practical matter, that the Debtors will be able to meet their obligations under the Plan on a timely basis and according to its terms.  The Debtors believe that the Plan is feasible as a liquidating plan.

4.        **Classification of Claims**

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code, which require that a Plan of liquidation place each Claim or Interest in a Class with other Claims or Interests that are "substantially similar."

F.        **Additional Requirements of Section 1129(b) of the Bankruptcy Code.**

Pursuant to Section 1129(b), the Bankruptcy Court must determine whether the Plan is fair and equitable and does not discriminate unfairly against each Impaired Class of Claims or Interests that has not accepted the Plan.  The Plan will not discriminate unfairly if no Class receives more than it is legally entitled to receive for its Claims.  "Fair and equitable" has different meanings for Secured Claims, Unsecured Claims, and Equity Interests.

With respect to an Unsecured Claim, "fair and equitable" means either (i) the Holder of an Allowed Unsecured Claim receives property of a value equal to the amount of its Allowed Claim, or (ii) the Holders of Claims or Interests that are junior to the Claims of the dissenting Class will not receive any Property under the Plan.

- 42 -

With respect to a Class of Equity Interests, "fair and equitable" means either (i) each Holder of an Interest of such Class receives or retains on account of such Interest Property with a value equal to the greater of the allowed amount of any fixed liquidation preference to which such Holder is entitled, any fixed redemption price to which such Holder is entitled or the value of such Interest, or (ii) the Holder of any Interest that is junior to the Interests of such Class will not receive or retain any Property on account of such junior Interest.

The Debtors believe the Plan meets the fair and equitable test with respect to each Holder of an Impaired Claim or Interest. A corollary to the fair and equitable requirement is that no Class of Claims receive more than payment in full. The Debtors do not believe that Class 2 (Unsecured Claims) would recover more than payment in full under the Plan, from the Sale Proceeds, proceeds of the D&O Litigation, or any other Property to be transferred to the Liquidating Trust under the Plan, after payment of Allowed Priority Claims as provided in the Plan.

## G.    Objections to Confirmation.

As set forth in the *Solicitation and Voting Procedures* [Docket No. •] (the "**Solicitation and Voting Procedures**"), filed contemporaneously herewith, any objections to Confirmation of the Plan must be in writing, must set forth the objector's standing to assert any such objection, and must be filed with the Bankruptcy Court and served on counsel for the Debtors and counsel for the Creditors' Committee. The Solicitation and Voting Procedures will contain all relevant procedures relating to the submission of objections to Confirmation and should be reviewed in its entirety by any party who has an objection to Confirmation of the Plan.

## H.    Hearing on Confirmation of the Plan.

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. At that time, the Debtors will present the results of the vote by each Impaired Class of Creditors entitled to vote in favor of or in opposition to the Plan. The Bankruptcy Court will consider whether the requirements for Confirmation of the Plan under the Bankruptcy Code have been satisfied, as well as any objections to the Plan that are timely filed. Any Creditor may object to the Confirmation of the Plan, regardless of whether such Creditor is entitled to vote on the Plan.

## XI.
## DISCHARGE, RELEASE, LIMITATIONS OF LIABILITY, AND GENERAL INJUNCTION UNDER THE PLAN

## A.    Plan Injunction.

**Except as otherwise expressly provided in the Plan, the Plan Supplement, documents executed pursuant to the Plan, or the Confirmation Order, on and after the Effective Date, all Persons who have held, currently hold, or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date (including all Governmental Units) shall be permanently enjoined from, on account of such Claims or Interests, taking any of the following actions, either directly or indirectly, against or with respect to any Debtor, any Estate, the Exculpated Parties, the Liquidating Trust, the Liquidating Trustee,**

or any of their respective properties or assets: (i) commencing or continuing in any manner any action or other proceeding of any kind; (ii) enforcing, executing, collecting, or recovering in any manner any judgment, award, decree, or order, or attaching any property pursuant to the foregoing; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind; (iv) asserting or effecting any setoff, recoupment, or right of subrogation of any kind against any Claim or Cause of Action; (v) enjoining or invalidating any foreclosure or other conveyance of any Property of the Liquidating Trust or of the Debtors; (vi) interfering with or in any manner whatsoever disturbing the rights and remedies of the Liquidating Trust, the Debtors or the Estates under the Plan and the Plan documents and the other documents executed in connection therewith; and (vii) taking any act, in any manner, in any place whatsoever, that does not conform to, comply with, or that is inconsistent with any provision of the Plan. This injunction shall not enjoin or prohibit (i) the holder of a Disputed Claim from litigating its right to seek to have such Disputed Claim declared an Allowed Claim and paid in accordance with the Distribution provisions of the Plan or (ii) any party in interest from seeking the interpretation or enforcement of any of the obligations of the Debtors, the Liquidating Trustee, or the Liquidating Trust under the Plan. The Liquidating Trustee shall have the right to independently seek enforcement of the Plan Injunction provision.  The Plan Injunction provision is an integral part of the Plan and is essential to its implementation.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each Holder of an Allowed Claim, by accepting, or being eligible to accept, Distributions under such Claim, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article X of the Plan.

B.    **Exculpation from Liability.**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and notwithstanding anything herein to the contrary, the Debtors, their current and former officers and directors, and the Debtors' Professionals (acting in such capacity) and the members of the Creditors' Committee and the Creditors' Committee's Professionals (acting in such capacity) (the foregoing collectively referred to herein as the "Exculpated Parties") are hereby released and exculpated from any Claim, obligation, Cause of Action, or liability of any kind whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law or in equity, for any action taken or omitted to be taken, in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, including solicitation of acceptances thereto, the Disclosure Statement, any Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into, including without limitation the Purchase Agreement, or any other act taken or omitted from being taken, in connection with the Sale, the Plan or these Chapter 11 Cases, including but not limited to the commencement and administration of these Chapter 11 Cases, the sale of assets, the arranging for post-petition financing, the prosecution and defense of contested matters and adversary proceedings, the settlement of Claims, and the disbursement of funds (including, for the avoidance of doubt, providing any legal opinion

- 44 -

requested by any Person regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), or any other post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring or liquidation of the Debtors, in each case except for actual fraud, willful misconduct, or gross negligence in connection with the Plan or the Chapter 11 Cases, each solely to the extent as determined by a Final Order of a court of competent jurisdiction; *provided*, *however*, that in all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the transactions contemplated herein, including the Sale, the negotiation, formulation, or preparation of the agreements, instruments, or other documents pursuant to the Plan or the Sale, and the solicitation and distribution of the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, this exculpation shall not release any obligation or liability of any party under the Plan or any document, instrument, or agreement (including those set forth in any Plan Supplement) executed to implement the Plan.  In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a Plan or the offer, issuance, sale or purchase of securities.  This Exculpation from Liability provision is an integral part of the Plan and is essential to its implementation.

**C.**     **Preservation of Insurance.**

Except as otherwise provided herein, the Debtors' discharge and release from all Claims as provided herein, except as necessary to be consistent with the Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, including its officers and current and former directors, or any other Person.

**D.**     **Continuation of Automatic Stay.**

The automatic stay arising out of Section 362(a) of the Bankruptcy Code shall continue in full force and effect pursuant to Section 362(c)(2) of the Bankruptcy Code.  The Court shall have the power to grant such additional and supplemental stays as may be necessary or appropriate to protect and preserve the Assets of the Debtors, the Estates and/or the Liquidating Trust or to permit the just and orderly administration of the Estates.

**E.**     **Binding Effect of Plan.**

Except as otherwise provided in Section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, subject to the occurrence of the Effective Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates and their respective

- 45 -

successors or assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan, whether or not such Holder has accepted the Plan and whether or not the Holder has Filed a Claim.

## F.   No Liability for Tax Claims.

Unless a taxing Governmental Authority has asserted a Claim against the Debtors before the Bar Date or Administrative Expense Claim Bar Date established therefore, no Claim of such Governmental Authority shall be Allowed against the Debtors, the Estates, the Liquidation Trust, the Liquidating Trustee, or their directors, officers, employees or agents for Taxes, penalties, interest, additions to tax or other charges arising out of (a) the failure, if any, of the Debtors, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (b) an audit of any return for a period before the Petition Date. The entry of the Confirmation Order shall be deemed to be a determination that no provision of the Plan has avoidance of Taxes as a principal purpose, and the Confirmation Order shall so provide.

## G.   No Liability for Untimely Administrative Expense Claims.

Holders of Administrative Expense Claims (including Holders of any Claims for post-petition Taxes) that do not file an application or other Bankruptcy Court-approved pleading by the Administrative Expense Claims Bar Date will be forever barred from asserting such Administrative Expense Claims against the Debtors, the Estates, or any of their respective Property.

## H.   Regulatory or Enforcement Actions.

Nothing in the Plan shall restrict any federal government regulatory agency from pursuing any regulatory or police enforcement action or performing its statutory duties against any Person or Entity in any forum, but only to the extent not prohibited by the automatic stay of Section 362 of the Bankruptcy Code or discharged or enjoined pursuant to Section 524 or 1141(d) of the Bankruptcy Code.  Nothing contained in this section is intended to, nor shall it, supersede or alter any applicable provisions of the Bankruptcy Code.

## XII.
## FEDERAL TAX CONSIDERATIONS

## A.   General.

A description of certain U.S. federal income tax consequences of the transactions proposed in the Plan is provided below. This description is based upon the IRC, final and temporary Treasury Regulations promulgated thereunder, judicial decisions and administrative determinations of the Internal Revenue Service ("**IRS**") in effect as of the date of this Disclosure Statement.  Changes in these authorities, which may have retroactive effect, or new interpretations of existing authority may cause the U.S. federal income tax consequences of the Plan to differ materially from the consequences described below.  No rulings have been requested from the IRS and no legal opinions have been requested from counsel with respect to any tax consequences of the Plan.  No tax opinion is given by this Disclosure Statement.

- 46 -

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to Holders of the Allowed Unsecured Claims. This summary does not address the U.S. federal income tax consequences to Holders whose Claims or Equity Interests (i) are paid in full, in cash, or which are otherwise not Impaired under the Plan (*i.e.*, Allowed Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims) or (ii) that are not receiving any Distribution under the Plan.

This description does not cover all aspects of federal income taxation that may be relevant to the Debtors or Holders of Claims. For example, the description provided below does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations, foreign taxpayers, investors in pass-through entities, broker dealers and tax-exempt organizations. The description also does not address state, local or foreign tax considerations that may be applicable to the Holders of Claims.

Further, this description assumes that all Holders of Claims are U.S. persons and does not address tax consequences to any Holders of Claims that are not U.S. persons. For purposes of this discussion, a U.S. person is any of the following: (i) a citizen or resident of the United States; (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income tax regardless of its source; or (iv) a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more U.S. persons or (2) has validly elected to be treated as a U.S. person for U.S. federal income tax purposes. If a partnership (or other entity taxed as a partnership for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner in the partnership generally will depend on the status of the partner and upon the activities of the partnership. Accordingly, partnerships that are holders of Claims are urged to consult their tax advisors regarding the specific U.S. federal income tax consequences to them.

**NO RULING HAS BEEN SOUGHT OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OBTAINED BY THE DEBTORS WITH RESPECT THERETO. NO REPRESENTATION OR ASSURANCE IS BEING MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES AS DESCRIBED HEREIN. CERTAIN TYPES OF CREDITORS AND INTEREST HOLDERS MAY BE SUBJECT TO SPECIAL RULES NOT ADDRESSED IN THIS SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES. THERE MAY ALSO BE STATE, LOCAL, OR FOREIGN TAX CONSIDERATIONS APPLICABLE TO EACH HOLDER OF A CLAIM OR EQUITY INTEREST WHICH ARE NOT ADDRESSED HEREIN. EACH HOLDER OF A CLAIM OR EQUITY INTEREST AFFECTED BY THE PLAN MUST CONSULT AND RELY UPON SUCH HOLDER'S OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER'S CLAIM OR EQUITY INTEREST. THIS INFORMATION MAY NOT BE USED OR QUOTED IN WHOLE OR IN PART IN CONNECTION WITH THE OFFERING FOR SALE OF SECURITIES.**

B.    **Federal Income Tax Consequences to Holders of Claims.**

Assuming the Liquidating Trust is taxed as a "grantor trust" or as a "partnership" for federal income tax purposes, under the Plan, a Holder of a Claim generally will recognize taxable gain or loss to the extent of the difference between the amount realized (*i.e.*, the amount of cash and the value placed on the other assets deemed contributed) by the Holder to the Liquidating Trust in respect of its Claim, excluding accrued interest, and the Holder's tax basis in the Claim, excluding any claim for accrued interest.

The tax character of a Holder's gain or loss as capital or ordinary will be determined by a number of factors, including whether the creditor has a special tax status (such as being a dealer in securities, a financial institution, or an insurance company), or whether the Claim was a capital asset in the hands of the Holder. In addition, whether the Claim was purchased with original issue discount or market discount could affect the character of any gain or loss that is recognized as capital or ordinary gain or loss. Likewise, the basis of such Claim for purposes of determining the amount of any gain or loss recognized on the exchange can be affected by such factors as whether such obligation was purchased with original issue discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to such Claim.

As discussed below, assuming the Liquidating Trust is taxed as a "grantor trust" or as a "partnership" for federal income tax purposes, in the future, each Holder of a Claim will be required to report such Holder's share of the income of the Liquidating Trust.

C.    **Tax Treatment of Liquidating Trust and Contribution of Assets.**

The Liquidating Trust is intended to be treated as a "liquidating trust" pursuant to Treasury Regulation § 301.7701-4(d) and as a "grantor trust" for federal income tax purposes, pursuant to Section 671 through 679 of the IRC. However, no ruling has been sought from the IRS that the Liquidating Trust will meet the standard for classification as a "liquidating trust" and no assurance can be given that the IRS will not disagree with this conclusion that the Liquidating Trust is taxable as a grantor trust for federal income tax purposes. Assuming the Liquidating Trust is recognized as a grantor trust for federal income tax purposes, the Creditors of the Debtors that are Beneficiaries of the Liquidating Trust will be treated as the "grantors" of the Liquidating Trust, and the Liquidating Trust will be disregarded for tax purposes as an entity separate from the "grantors." The grantors will report the income and loss from the Liquidating Trust as if they held their proportionate interest in the assets of the Liquidating Trust, and received the income and paid expenses of the Liquidating Trust, directly (instead of through the Liquidating Trust). Assuming the Liquidating Trust is a grantor trust, the Liquidating Trust will file annual information returns (a Form 1041, with attached informational statements) with the IRS reporting each "grantor's" respective share of income received and expense paid by the Liquidating Trust.

Accordingly, assuming the Liquidating Trust is recognized as a grantor trust for U.S. federal income tax purposes, the transfer of Cash and any remaining Assets of the Debtors to the Liquidating Trust will be treated for U.S. federal income tax purposes as if the Debtors distributed an interest in each of the Assets transferred directly to the Holders of Claims in exchange for their outstanding Claims against the Debtors. Each Creditor would then be deemed to contribute its interest in these Assets to the Liquidating Trust. No gain or loss is recognized by a Holder of a

- 48 -

Claim on the "deemed" contribution of the interest in these Assets to the Liquidating Trust and the basis in its interest in the Liquidating Trust will equal the aggregate basis in the assets contributed in the Liquidating Trust after taking into account any gain or loss recognized by a Holder of a Claim on the receipt of the interests in these Assets of the Debtors (as discussed above).

If the Liquidating Trust is not treated as a grantor trust for federal income tax purposes, then the Liquidating Trust likely will be classified as a "partnership" for federal income tax purposes (so long as the Liquidating Trust does not make an election to be taxed as a corporation for federal income tax purposes), in which case the Creditors of the Debtors that are Liquidating Trust Beneficiaries will be treated as "partners" of the "partnership" for federal income tax purposes. Unlike a grantor trust, the "partnership" would be treated as an entity required to compute income and loss, file tax returns, and make tax elections, but income and loss would pass through to the Liquidating Trust Beneficiaries (who are considered "partners" of the "partnership" for federal income tax purposes) to be reported by them on their separate income tax returns. If the Liquidating Trust is treated as a "partnership" for U.S. federal income tax purposes, the Liquidating Trust Beneficiaries will be treated for U.S. federal income tax purposes as if the Debtors had distributed the interests in each of the assets so transferred directly to the Holders of Claims in exchange for their outstanding Claims against the Debtors and the Holders then contributed the interests in these assets to a "partnership" for federal income tax purposes in exchange for an interest in the "partnership." No gain or loss is recognized upon the deemed exchange of the interests in these Assets for an interest as a "partner" in the "partnership." Each Holder's basis in its interest in the "partnership" will equal the aggregate basis in the assets deemed contributed to the "partnership" after taking into account any gain or loss recognized by a Creditor or shareholder on the receipt of the interests in these assets from the Debtors (as discussed above). The partners of the partnership will be required to report their share of income, gain, loss, deduction or credit allocated to them by the partnership. Assuming the Liquidating Trust is a partnership, the Liquidating Trust will file annual returns (a Form 1065, with attached Schedule K-1s for each partner) with the IRS, and issue to each partner a K-1 reporting each "partner's" respective share of income, gain, loss deduction or other item of the Liquidating Trust.

**D.**    **Accrued Interest.**

To the extent that any amount received by a Holder of a Claim is attributable to accrued but untaxed interest, such amount should be taxable to the Holder as interest income, if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, a Creditor may be able to recognize a deductible loss for such purposes to the extent that any accrued interest was previously included in the Creditor's income but was not paid in full by the Debtors. The extent to which any consideration received by a Holder under the Plan will be attributable to accrued but untaxed interest is unclear. The Debtors will treat the aggregate consideration to be distributed to the Creditors as first satisfying the stated principal amount of the Claims with any excess allocated to accrued, but unpaid interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a bankruptcy plan is binding for U.S. federal income tax purposes. However, the IRS could take a different view.

E.    **Backup Withholding.**

        Under the IRC's backup withholding rules, a Holder of a Claim should be subject to back-up withholding with respect to distributions or payments made pursuant to the Plan unless that Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional income tax, but merely an advance payment of income tax that may be claimed as a credit on the income tax return of the person that is subject to backup withholding and refunded to the extent it results in an overpayment of income tax on such return. Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

F.    **Not Intended as Tax Advice.**

        **THE FOREGOING DISCUSSION IS NOT INTENDED AS TAX ADVICE TO THE DEBTORS' CREDITORS AND EQUITY HOLDERS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES TO THEM UNDER THE PLAN. THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY. IT IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR CONSULTATION WITH A TAX ADVISOR THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT SUCH HOLDER'S OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

## XIII.
## LIQUIDATION ANALYSIS

        The Debtors have analyzed whether a liquidation of the Debtors' remaining assets by a Chapter 7 trustee, who is unfamiliar with the Debtors and their Assets, would result in a higher return to the Creditors of the Estate than under the proposed Plan. Given that the Plan proposes a liquidation of the Debtors' remaining Assets by those most familiar with them, the Debtors have concluded that a Chapter 7 liquidation would likely result in a net return to Creditors that is lower than the net return to Creditors that can realistically be realized through the Plan and would take significantly longer for Creditors to receive any such Distribution.

        The Debtors believe that liquidation under Chapter 7 of the Bankruptcy Code would result in diminution in the value to be realized by Holders of Unsecured Claims under the liquidation proposed by the Plan. In the event the Debtors are forced to complete their liquidation in Chapter 7, the resulting disruption, uncertainty, and delay would almost certainly diminish the value of the Debtors' remaining assets, as the layer of expense occasioned by the appointment of a Chapter 7 trustee would be more than what is estimated by the Liquidating Trustee under the Plan continuing to retain the Professionals and consultants who are already familiar with the Claims and other

issues facing the Debtors. Additionally, conversion of the Chapter 11 Cases to Chapter 7 would result in the Bar Date being reset, and otherwise late claims being treated as timely. As a result, this potentially could enlarge the number of Allowed Claims (thereby decreasing the amount of Distributions to current Holders of Allowed Claims). Consequently, it is believed that the Plan will provide a greater, quicker, and more certain return to Creditors than would liquidation of the Debtors' Assets by a Chapter 7 trustee who is unfamiliar with the Debtors and their business and who would likely take significantly longer to make a Distribution to Creditors.

## XIV.
## MISCELLANEOUS PLAN PROVISIONS

**A.      No Admissions.**

The Plan provides for the resolution, settlement and compromise of Claims against and Equity Interests in the Debtors. Nothing contained in the Plan or in the Disclosure Statement will be construed to be an admission of any fact or otherwise binding upon the Debtors in any manner prior to the Effective Date.

**B.      Revocation or Withdrawal of the Plan.**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation of the Plan does not occur, then the Plan will be deemed null and void in all respects, and nothing contained in the Plan will be deemed (a) to constitute a waiver or release of any Claims by or against, or Equity Interests in, the Debtors or any other Person, (b) to constitute a waiver or release of any Claims by the Committees, or (c) to prejudice in any manner the rights of the Debtors or any other Person, including the Committee, in any further proceedings involving the Debtors.

**C.      Further Assurances.**

The Debtors and the Liquidating Trustee are authorized to execute and deliver any and all papers, documents, contracts, agreements, and instruments that may be necessary to carry out and implement the terms and conditions of the Plan.

**D.      Headings.**

The headings and table of contents used in the Plan are for convenience and reference only and will not constitute a part of the Plan for any other purpose or in any manner affect the construction of the provisions of the Plan.

**E.      Governing Law.**

Except to the extent that federal law (including the Bankruptcy Code or the Bankruptcy Rules) is applicable, or to the extent that the Plan or a provision of any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan provides otherwise, the rights and obligations arising under the Plan will be governed by, construed, and enforced in accordance with the laws of the State of Florida, without giving effect to the principles

of conflicts of law thereof.

## F.     Entire Agreement.

The Plan and Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No Person will be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

## G.     Closing of Case/ Charitable Contribution.

The Liquidating Trustee shall be authorized to apply to the Bankruptcy Court for authority to close the Bankruptcy Cases at any time when the Plan has been substantially consummated, the final Distribution has been made or as otherwise appropriate. If, after all Causes of Action have been resolved and Assets liquidated or otherwise administered and the proceeds thereof distributed in accordance with the Plan, including by Distributions, the Liquidating Trustee may determine that the expense of administering the Plan is likely to exceed the remaining amount of the Liquidation Proceeds, the Liquidating Trustee shall apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to close the Bankruptcy Cases; (ii) donate any balance to a charitable organization selected by the Liquidating Trustee and which is exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code; and (iii) close the Bankruptcy Cases in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

## XV.
## RETENTION OF JURISDICTION

The Bankruptcy Court shall retain jurisdiction, notwithstanding entry of the Confirmation Order and notwithstanding the occurrence of the Effective Date of the Plan, for the following purposes:

(a)     to determine any motion, adversary proceeding, Avoidance Action, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(b)     to hear and determine applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, estimation, or payment of Rejection Claims and Cure Amounts resulting therefrom;

(c)     to ensure that Distributions to holders of Allowed Claims are accomplished as provided herein and to adjudicate any and all disputes arising from or relating to Distributions under the Plan;

(d)     to hear and determine objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without limitation, to hear and determine objections to the classification of Claims and the allowance or disallowance of Disputed Claims, in whole or in part;

- 52 -

(e)     to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim; provided, however, that the District Court shall have jurisdiction to estimate any Claim that cannot be estimated by the Bankruptcy Court;

(f)     to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)     to determine any matter (other than those matters that are subject to the exclusive jurisdiction of the United States District Court for the Eastern District of Virginia in the admiralty action styled *R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel*, Case No. 2:93-cv-902, including, but not limited to, the Admiralty Order) (i) under the Purchase Agreement; (ii) in connection with the Sale Transaction; or (iii) the Sale Order;

(h)     to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(i)     to hear and determine any application to modify the Plan in accordance with Section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(j)     to hear and determine all Professional Compensation Claims;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Confirmation Order or any transactions or payments contemplated hereby or thereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(l)     to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan and the Liquidating Trust Agreement, including any release or injunction provisions set forth therein, or to maintain the integrity of the Plan following consummation;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning Taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     to enter a Final Decree closing the Chapter 11 Cases;

(p)     to recover all Assets of the Debtors and the Liquidating Trust, and Property of the Estates, wherever located;

38680380

(q)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors and/or the Liquidating Trust pursuant to the Bankruptcy Code or pursuant to any statute or legal theory;

(r)     to hear and determine any matters for which jurisdiction was retained by the Bankruptcy Court pursuant to prior orders; and

(s)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code, title 28 of the United States Code, and other applicable law.

Upon any default under the Plan, the Debtors and the Liquidating Trustee, as the case may be, consent to the jurisdiction of the Bankruptcy Court or any successor to the Bankruptcy Court and agree that it will be the preferred forum for all proceedings relating to any such default.  Except as otherwise provided in the Plan or the Plan Documents, by accepting any Distribution or payment under or in connection with the Plan, by filing any Proof of Claim, by voting on the Plan, or by entering an appearance in the Bankruptcy Cases, all Creditors and other parties in interest, including foreign Creditors and foreign parties in interest, have consented, and will be deemed to have expressly consented, to the jurisdiction of the Bankruptcy Court for all purposes with respect to any and all matters relating to, arising under or in connection with the Plan or the Bankruptcy Cases.

## XVI.
## MODIFICATIONS AND AMENDMENTS

The Debtors reserve the right to alter, amend or modify the Plan as contemplated by Section 1127 of the Bankruptcy Code. The Plan may be modified, before or after Confirmation, without notice or hearing, or on such notice and hearing as the Court deems appropriate, if the Court finds that the proposed modification does not materially and adversely affect the rights of any parties in interest that have not had notice and an opportunity to be heard with regard to the proposed modification. Without limiting the foregoing, the Plan otherwise may be modified after notice and hearing.  In the event of any modification at or before Confirmation, any votes in favor of the Plan shall be deemed to be votes in favor of the Plan as modified, unless the Court finds that the proposed modification materially and adversely affects the rights of the parties in interest that cast said votes.

## XVII.
## CONCLUSION

The Debtors urge all Holders of Claims to accept the Plan because the Debtors and the Creditors' Committee believe the Plan will provide each such Holder more than it would receive pursuant to any alternative plan of liquidation or under Chapter 7 of the Bankruptcy Code. Accordingly, Debtors and the Creditors' Committee urge all eligible members of Voting Classes to submit Ballots in favor of the Plan in accordance with the balloting procedures described herein.